**UNITED STATES of America, Plaintiff,**

v.

**Steven A. VAGUE and Gerald E. McDermott, Jr., Defendants.**

**In the Matter of Robert A. DeMEO, Attorney.**

**No. 80 CR 713.**

United States District Court, N. D. Illinois, E. D.

Aug. 6, 1981.

William M. Doty, Jr., Chicago, Ill., for Robert A. DeMeo.

## MEMORANDUM DECISION AND ORDER

GRADY, District Judge.

The question presented here is whether a judge should take action, *sua sponte*, when it appears that a defendant in a criminal case has been charged a clearly excessive fee by his privately retained attorney. A statement of the facts will put the matter in focus.

### THE FACTS

The indictment names two defendants, Steven A. Vague and Gerald E. McDermott, Jr., both of whom have now been sentenced after pleas of guilty. Vague received 90 days on work release, followed by five years probation, and McDermott received four years probation under the Youth Corrections Act, 18 U.S.C. § 5010. The fee question arises only in the case of the defendant Vague.

The indictment, which concerns the possession of freight stolen at O'Hare International Airport in Chicago, is in five counts. Count I charges that Vague and McDermott violated 18 U.S.C. § 371, the federal conspiracy statute, by conspiring to receive and possess various items of freight which were stolen from interstate and foreign air shipments moving through O'Hare, in violation of 18 U.S.C. § 659. It was charged that the goods were stolen from the possession of AM Air Freight, Inc. and consisted of such things as leather coats, fur coats, cameras, and watches. The remaining four counts of the indictment alleged substantive violations of § 659, charging the defendants with unlawful possession of specific stolen items on particular dates.

The facts of the case, as disclosed by the defendants' admissions when they entered their pleas of guilty and by the subsequent presentence investigation conducted by the Probation Office, are simple. Steven Vague, age 23, worked as a truck driver for AM Air Freight Company, a trucking company which carried freight to and from O'Hare Airport. The company was owned by Vague's parents. The other defendant, Gerald E. McDermott, Jr., age 22, was a partner in Sunrise Air Freight, a similar business. In April 1980, McDermott was arrested in Carpentersville, Illinois, for un-

lawfully discharging a firearm. McDermott's gun was confiscated and Officer Dwight Willenius of the Carpentersville Police Department told him the gun might not be returned. McDermott volunteered that if he could get the gun back they might be able to work something out, since there was always "a lot of stuff floating around the airport." Thereafter, McDermott and Willenius discussed the possibility of obtaining stolen cameras. McDermott obtained some stolen cameras from Steven Vague and asked Willenius if he was interested. Willenius said he would have to check with "Frank S." Shortly thereafter, McDermott, Willenius and Frank S. had a meeting, at which it was agreed that Frank S. would "get rid of" anything McDermott could obtain. McDermott then introduced Vague to Willenius and Frank S. On August 6, 1980, McDermott obtained three fur coats from Vague and sold them to Frank S. for $125.00 each. These coats were stolen out of a shipment from Poland which had been picked up by AM Air Freight at O'Hare Airport for delivery to the consignee in Chicago. Thereafter, during the summer of 1980, McDermott and Vague sold to Frank S. various items described in the indictment, all of which had been stolen from foreign shipments handled by AM Air Freight.

"Frank S." was, unknown to Vague and McDermott, an agent of the United States Customs Service. He was also wired for sound during many of his conversations with the defendants. Not surprisingly, these conversations are highly incriminating to the defendants. On one tape, for instance, Steven Vague is heard to say, "If there's ever anything taken off that airport, it does not go by my vision. I've heard about everything.... That's why I'm out there. I'm not out there to make a living, I'm out there to set things up."

On December 1, 1980, Vague invited Frank S. to inspect some merchandise at Vague's residence. The agent went there and Vague displayed 75 leather coats and some photographic lenses and digital watches, all of which had been stolen from foreign shipments. At this point, Vague was placed under arrest by other agents who descended upon the premises. The items in his possession at that time were seized and are the subject of Count V of the indictment.

The next day Officer Willenius telephoned McDermott and told him to turn himself in, along with any stolen merchandise he possessed. Pursuant to these instructions, McDermott surrendered at the office of the Customs Service and turned in some additional stolen articles.

On December 2, 1980, the defendant Vague was brought before a United States magistrate for the purpose of setting bail. Attorney Robert DeMeo, whose fees are in question here, filed his appearance on behalf of Vague at that time. Vague, who lives with his parents and has no prior criminal record, was released on his own recognizance. The case was continued to December 9, 1980, for a probable cause hearing.

On December 9, the magistrate conducted a preliminary hearing and made a finding of probable cause. The defendants were held to the district court.

The indictment was returned on December 23, 1980, and the defendants were arraigned on January 9, 1981. Both defendants entered pleas of not guilty. The parties were ordered to hold a pretrial conference pursuant to our local Rule 2.04 (a self-executing rule which requires the parties to turn over all discovery materials which would be appropriate under Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215) within 5 days after arraignment. The order also provided that any pretrial motions were to be filed by January 19, 1981, and the case was set for a status report on February 3, 1981.

On January 21, 1981, Attorney DeMeo filed five separate motions on behalf of the defendant Vague. They were as follows:

1. "Motion to Discover Use of Electronic Devices." This motion, which is described in its title, sought information which the government was already required to turn over pursuant to our Local Rule 2.04. As

noted later in this opinion, the government was willing to produce the tape recordings and apparently had already done so.

2. "Motion for Discovery and Inspection." This was a boilerplate motion seeking discovery of the items the government is required to turn over pursuant to Rule 2.04, such as evidence favorable to the defendant and any written statement of the defendant. The motion also requested items the government is rarely required to produce and are routinely denied, e. g., a written list of the names and addresses of all prospective government witnesses.

3. "Motion to Inspect Grand Jury Minutes." The principal purpose of this motion, consisting of a little over one page, was ". . . to determine whether there was in fact the requisite number of Grand Jurors concurring in the findings of the true bill under Rule 6(e) of the Federal Rules of Criminal Procedure . . . ." The motion set forth no grounds for believing that there was any irregularity in the Grand Jury proceeding, nor any other reason which would justify making an exception to the usual rule of Grand Jury secrecy.

4. "Motion to Dismiss Indictment." The best way to describe this motion is to quote it in its entirety:

NOW COMES THE DEFENDANT, STEVEN A. VAGUE, by his Attorney, ROBERT A. DE MEO, and moves this Court, pursuant to Rule 12 of the Federal Rules of Criminal Practice (sic) to dismiss the indictment in the instant case and in support thereof states as follows:

1. The indictment and each count thereof fails to inform the Defendant, STEVEN A. VAGUE, of the nature and cause of the accusations against him with the certainty required by law.

2. The indictment and each count thereof is void as it merely states conclusions and does not advise the Defendant, STEVEN A. VAGUE, of the acts he allegedly committed to constitute the offense charged.

3. The indictment and each count thereof fails to charge the commission of acts by this Defendant, STEVEN A.

VAGUE, constituting any offense against any Statute of the United States with the certainty required by law.

4. The indictment and each count thereof is insufficient and violates Rule 7(c) of the Federal Rules of Criminal Procedure in that it fails to set forth in a plain, concise and definite manner the essential facts constituting the offenses attempted to be charged.

5. Specifically, Count 1 of the Indictment is defective because it fails to allege that the objects of the conspiracy to be (sic) an offense against the United States of America.

6. Counts 2, 3, 4 and 5 fail to set forth with particularity where, when or how Defendant, STEVEN A. VAGUE, wilfully and knowingly violated Federal Law and how Defendant managed, established or condicted (sic) alleged unlawful activity.

The indictment in this case was more than sufficient to meet the pleading requirements of Rule 7(c)(1), Fed.R.Crim.P., which states that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." Count I alleges the conspiracy in more detail than would be necessary, and each of the substantive counts alleges in specific terms that on a particular date the defendants possessed described property which had been stolen from foreign shipments, knowing it to have been stolen. The motion to dismiss was entirely specious. That there was obviously no argument to be made in support of the motion may explain why Mr. DeMeo ignored our local criminal rule 2.05(c), which requires that all contested motions be "accompanied by a short, concise brief in support of the motion, together with citations of authority." No brief was filed in support of any motion.

It may be significant that none of these motions was ever served on the government. Mr. DeMeo simply filed them in the Clerk's office. When the attorney for the government appeared at the status call on February 3, he was surprised to learn, when

informed by the court, that motions had been filed. Mr. Louis Aldini, an associate of Mr. DeMeo, appeared on that date because Mr. DeMeo was out of town. The status call as to the defendant Vague was continued until February 5. At the status call of February 3, the defendant McDermott entered a plea of guilty to Counts I and IV of the indictment. The plea was pursuant to a written agreement whereby the government undertook to dismiss the remaining counts against McDermott, and, for his part, McDermott agreed to cooperate with the government in any investigation of the case. His cooperation was to "include his truthful testimony if called upon to testify, before any federal grand jury and United States District Court proceeding." The case as to McDermott was referred to the Probation Office and set for sentencing on March 13, 1981. Trial of the defendant Vague was set for February 17, 1981.

On February 5, the case was called again as to the defendant Vague. Mr. DeMeo stated that all discovery he desired had been furnished by the government. The three discovery motions, as well as the motion to dismiss the indictment, were thereupon denied.

On February 11, the government filed a motion to continue the trial date for defendant Vague from February 17 to March 16 due to the engagement of government counsel. The government also requested that the time the defense motions had been pending—January 21 to February 5—be excluded under the Speedy Trial Act. The motions were allowed without objection.

By March 16, the parties had entered into a written plea agreement for Vague similar to that of McDermott, and on that date Vague entered a plea of guilty to Counts I and V of the indictment. His case was referred to the Probation Office for a presentence investigation and sentencing was set for April 23.

It is customary in this district for the presentence report of the Probation Office to describe the defendant's assets and liabilities, including, among the latter, the amount of the fee he is paying his attorney. The presentence report in this case disclosed that Mr. DeMeo's fee was $12,000.00. The defendant had paid $11,000.00 and was intending to pay the remaining $1,000.00.

When the case was called for sentencing on April 23, 1981, I asked Mr. DeMeo to explain the basis for his $12,000.00 charge. He responded that when he had originally set the fee he had anticipated the case would go to trial. I inquired whether he believed that some adjustment was appropriate in view of the fact that there had been no trial. He replied that he did. I asked how much Mr. DeMeo thought the fee should be reduced, and he responded that he had not given the matter any thought. I then indicated that he should give the matter some thought and discuss it with his client and the client's father (who, it developed, had actually advanced the money). Sentencing was continued to May 12.

On May 12, Mr. DeMeo reported that he had decided to reduce the fee to $8,000.00. I stated that I believed $8,000.00 was too much for a plea of guilty and that a further reduction was necessary. Mr. DeMeo replied, "Your Honor, that is a matter between my client and myself," thus succinctly stating the issue with which this opinion deals. I expressed the view that the court has a responsibility in the matter and then proceeded to make inquiry as to the amount of time Mr. DeMeo had spent on the case. All of the knowledgeable persons were before the court—Mr. DeMeo, the defendant, the defendant's father and the Assistant United States Attorney who had handled the case from the outset—and they all answered the questions put to them.

Mr. DeMeo stated that he had spent ten or twelve hours in conferences with his client, Steven Vague. Steven Vague said that he believed he had spent about eight hours in conference with Mr. DeMeo, and Steven's father said he had spent about 1½ hours in conference with the attorney.

Mr. Robert J. Hackman, the Assistant United States Attorney, estimated that he had spent a total of 60 to 90 minutes with

Mr. DeMeo, and Mr. DeMeo agreed. Mr. Hackman stated that he had turned over to Mr. DeMeo 37 sound tapes with playing time of 45 minutes each. Most of the tapes had been made before Vague had any conversations with the undercover agent and concerned only the defendant McDermott. Mr. DeMeo stated that he had listened to each of the tapes. This would be 27¾ hours playing time if he had listened to all of them. He stated he had spent at least an hour on each tape, which would come to 37 hours.

Mr. DeMeo said he had spent 3 to 4 hours in connection with the appearances before the magistrate for the setting of bond and the preliminary hearing. There were six appearances before the district court, and my own estimate is that this would have involved another 3 to 4 hours. No estimate was given for the time spent preparing the four pretrial motions referred to above. Mr. DeMeo stated that he had no time records and that his estimates were necessarily approximate. At the conclusion of this colloquy, I took the matter of Mr. DeMeo's fee under advisement and proceeded to impose sentence.

### RULE 2–106 OF THE ILLINOIS CODE OF PROFESSIONAL RESPONSIBILITY

■ The value of legal services is not, of course, a simple function of the time spent by the attorney. Other factors are involved, and I turn now to a discussion of whether the $8,000.00 fee is excessive when considered in the light of all relevant criteria.

The applicable standards for determining the propriety of Mr. DeMeo's fee are set forth in the Illinois Code of Professional Responsibility, which has been made a part of the disciplinary rules of the Illinois Supreme Court. These rules, derived largely from the disciplinary rules drafted by the American Bar Association and the Illinois State Bar Association, were adopted as rules of the Illinois Supreme Court effective July 1, 1980. Mr. DeMeo was admitted to the Illinois Bar in 1970 and enjoys his privi-lege to practice in this court by reason of his Illinois admission. This court has adopted no independent disciplinary standards.

Rule 2–106 of the Illinois Code of Professional Responsibility ("DR 2–106") provides in pertinent part:

Rule 2–106. Fees for Legal Services
(a) A lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee.

(b) A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment would preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

The use of DR 2–106 as the guide for determining reasonable fees has been expressly approved by the Seventh Circuit Court of Appeals. *Waters v. Wisconsin Steel Works*, 502 F.2d 1309, 1322 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823. This list clearly includes all factors which could possibly affect the fee in the inst_nt case. There follows an analysis of Mr. DeMeo's fee in terms of each of these elements.

*"(1) the time and labor required . . ."*

This case required some time but very little labor. The emphasis here should be on the word *required*. Busywork, the only apparent purpose of which is to impress the client and seem to justify the fee, must be disregarded. The pretrial motions filed in this case are that category. The motion to dismiss the indictment was a sham. The three discovery motions were not only unnecessary but were filed in violation of our Local Rule 2.04(c), which requires that a party seeking discovery beyond that provided by the other party in the conference must assert that the desired item was refused. In this case, nothing Mr. DeMeo desired was refused, as he acknowledged when he appeared before the court on February 5. At the arraignment on January 9, I ordered that a 2.04 conference be held pursuant to the rule, and the rule provides that the conference be held within five days after the arraignment. I assume, therefore, that the 2.04 conference was held before January 21, when Mr. DeMeo filed the motions. I noted above the possible significance of the fact that he did not serve government counsel with these motions. It was anomalous to file motions seeking the very materials the government had already furnished.

Whatever time and labor may have been involved in the pretrial motions in this case was not "required" within the meaning of Disciplinary Rule 2–106(1) and should be disregarded.

The time spent before the magistrate was appropriate. Obviously, a certain amount of conference time with the client and his parents was necessary, but if Mr. DeMeo really did spend 8 to 12 hours in such conferences, an element of busywork was involved. The case is just not that complicated. If trial preparations were involved, that would be something else. But, as will appear later if it is not clear already, no trial was ever contemplated here.

It was appropriate for Mr. DeMeo to listen to the 27¾ hours of tapes in the case, and, indeed, this is the principal item as to which "time and labor" can be claimed. If

it were not for this almost fortuitous fact that Frank S. saw fit to run his tape recorder so much, Mr. DeMeo would have no plausible basis for claiming any substantial time on this case.

Finally, it was necessary for Mr. DeMeo to make several court appearances, involving at most 4 hours time.

In my assessment, the maximum time reasonably required for Mr. DeMeo to perform any work he may have done that was intended to benefit his client was around 40 hours, almost three-quarters of which would have been spent simply listening to tape recordings. The "labor" required was minimal, a factor which blends into the next element.

*"(1) . . . the novelty and difficulty of the questions involved . . ."*

There was nothing novel and nothing difficult about any of the work required or performed in this case. If we were to posit an increasing novelty-difficulty scale of one to ten, surely this case would be a one, possibly a two. The defendant Vague was literally caught with the goods. There was no conceivable defense (no question of entrapment was even remotely suggested by the facts), and no sensible attorney, once confronted with the evidence, could seriously contemplate anything but a plea of guilty. The evidence against Vague consisted of the testimony of Wallenius, the police officer, Frank S., the United States Customs Agent, the incriminating tape recordings, the testimony of additional police officers and customs agents who arrested him in possession of stolen goods at his home, and, finally, the testimony of McDermott, his co-defendant, who had agreed to testify as part of his own plea-bargain. There was no doubt that the goods were stolen from foreign shipments, as Vague was in a peculiar position to know, since they were stolen from the very trucking company for which he worked. (The evidence points strongly to the conclusion that Vague was the thief, but he never admitted this, claiming that he received the stolen property from some other individual whose name he did not know.)

*"(1) ... the skill requisite to perform the legal service properly;"*

The skill required to represent Vague properly in this case is of a low order. It required no legal expertise whatever to determine from an examination of the readily available evidence that Vague had been knowingly selling property which had been stolen from foreign shipments. A layman could determine that just as easily as an attorney. While the conclusion that Vague's conduct violated Sections 371 and 659 of Title 18 of the United States Code is a legal one, it is still a conclusion that requires nothing but the ability to read a statute with a degree of comprehension necessarily possessed by one who has passed a bar examination. Section 371 provides in pertinent part that

> if two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000.00 or imprisoned not more than five years, or both.

Section 659 provides that

> whoever embezzles or steals or unlawfully takes, carries away or conceals ... from any ... motor truck, or other vehicle, ... or from any ... air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; or Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to be embezzled or stolen ...
> shall in each case be fined not more than $5,000.00 or imprisoned not more than ten years or both; but if the amount or value of such ... goods or chattels ... does not exceed $100.00, he shall be fined not more than $1,000.00 or imprisoned not more than one year, or both.

If there is any basis for arguing that the facts of this case do not fall squarely within the proscription of each of these statutes,

Mr. DeMeo never suggested one and none has occurred to me. The "skill requisite to perform the legal service properly" in this case was simply the skill to recognize that a violation had occurred, that there was no defense and that there were mitigating factors to argue on the matter of sentence.

*"(2) the likelihood that the acceptance of the particular employment would preclude other employment by the lawyer;"*

This element is irrelevant to a case of this kind. It contemplates situations where the work would be extraordinarily time consuming or where a conflict of interest would preclude the acceptance of other work.

*"(3) the fee customarily charged in the locality for similar legal services;"*

As indicated previously, the presentence report of the Probation Office will usually indicate the amount of the fee the defendant is paying. I have thus had an opportunity to note the fees charged by many attorneys in a wide variety of cases in this court. If anything is clear, it is that there is no "customary" fee for similar legal services in criminal cases. While it is only infrequently that I discover a fee I believe is clearly excessive, I am nonetheless struck by the wide range of fees, all arguably within the range of reasonableness, which are charged for essentially the same service by different attorneys. The limiting factors are the sophistication of the client, his ability to pay, and the conscience and judgment of the attorney. The problems arise in cases where, as here, the client is unsophisticated and has the ability to pay a substantial amount.

The range of fees for handling pleas of guilty is especially wide, and it is inexplicable in terms of any rational distinctions in the nature of the case or the value of the service. While every case is different, to be sure, the fact is that, assuming a certain minimal familiarity with the criminal law, there usually are no substantial differences in the amount of time, effort and ability required to handle one plea of guilty as opposed to another. Yet, one lawyer may

charge five or ten times what another lawyer would charge for handling a plea of guilty in an essentially similar case. That very situation is presented in the case at bar. According to the presentence report concerning the co-defendant Gerald E. McDermott, Jr., his attorney's fee was $1,250.00—approximately one-tenth the original fee charged by Mr. DeMeo for handling the identical case of the defendant Vague. McDermott's attorney is a competent and experienced federal practitioner who has performed well in a number of cases before me and before other judges in this district. The only difference I can see in the work he and Mr. DeMeo did is that he did not file any unnecessary or spurious motions.

*"(4) the amount involved and the results obtained;"*

The "result" obtained in a criminal case is a relevant factor in determining a fair fee, but here Mr. DeMeo set his fee, irrevocably as far as he was concerned, before any result whatever had been obtained. Even his decision to reduce the fee to $8,000.00 in response to the court's prompting was made before the defendant was sentenced; the only result he was aware of at that time was that the defendant stood convicted and in jeopardy of a substantial sentence. It is clear, therefore, that this factor of the "result" played no part in Mr. DeMeo's determination of what his fee should be.

The fact is that the result in the case—a conviction with probation and a short jail sentence—is about what one would expect, considering the nature of the offense, the defendant's age and his lack of any prior criminal record. Statistically, most first offenders in the federal courts receive probation. The likelihood of probation is especially great in cases, such as this one, which do not involve official corruption, violence or distribution of drugs. While Mr. DeMeo made an average plea in mitigation, he said nothing I did not know from the presentence investigation. No argument he made was influential in my determination of what the sentence should be. Clearly, a lengthy jail sentence would have been inappropriate in this case. On the other hand, due to the seriousness of the theft problem at O'Hare Airport, the apparent duration and extent of Vague's involvement and his lack of candor about how he came into possession of the stolen property, I believed a 90-day work release sentence to be proper in his case, although not in the case of McDermott, whose involvement was not as great. The principal function Mr. DeMeo actually performed in this case was to give Vague the sensible advice to plead guilty. For all we know, Vague would have been able to come to this conclusion on his own. I make these observations not to discount the importance of counsel, regardless of how routine the criminal case, but rather to emphasize that counsel frequently is little more than a bystander at events over which he has no control. This is especially true in pleas of guilty. Lawyers can affect the outcome of trials. I have seen apparent "losers" turned into winners by the outstanding performance of trial counsel, but a lawyer often has very little to do with what happens to his client once a plea of guilty has been entered. The major reason for this is that, given the completeness of the presentence report, there is usually not much for counsel to add.

The excessive fees I encounter almost invariably occur in cases where the defendant pleads guilty. Lawyers who take criminal cases to trial are, generally speaking, less likely to overcharge. One explanation for this is that the majority of persons who go to trial are indigent and are represented by attorneys appointed under the Criminal Justice Act, 18 U.S.C. § 3006A. The fees in these cases are set by the court according to the modest statutory rates of $20.00 per hour for work out of court and $30.00 per hour for work in court.

In the private cases, the defendant who goes to trial is often a person who has had previous experience with the criminal justice system, and, perhaps by reason of that experience, is better equipped to "shop around" for an attorney.

Perhaps the major reason the question of excessiveness arises more often in connec-

tion with a plea of guilty is that the situation involves such an enormous disparity between the work required of the lawyer and the importance of the case to the client. The lawyer ordinarily does very little work, yet the experience for the client is all-consuming. The lawyer, knowing the client is preoccupied with the seriousness of the trouble he is in, can easily be tempted to overestimate the value of his time and advice.

Returning to the subject of the "result" in the case, something should be said about the "plea agreement." Although Vague was named in all five counts of the indictment, the government agreed to dismiss three of the counts after Vague was sentenced on the two counts to which he pled guilty. This kind of "plea agreement" is routine in this district. It is rare that a defendant pleads guilty to all counts of an indictment. It is my observation that a plea to all counts most frequently occurs in cases where the defendant is represented by highly experienced counsel. This is because experienced counsel knows that in the usual case the number of counts is immaterial. The possible maximum sentences on the counts to which the defendant does plead guilty is always far in excess of what the facts would justify anyway. In this case, for instance, Vague's plea of guilty to Counts I and V exposed him to the possibility of 15 years in the penitentiary and a fine of $10,000.00. Clearly, no rational person would consider a penalty that severe. Another reason the dismissal of counts is unimportant is that in determining the appropriate sentence the court is entitled to consider the total offense picture, including the offenses involved in the dismissed counts, and the court will usually do so. The Parole Commission will also consider the entire presentence report, including the facts pertaining to the dismissed counts of the indictment.

The usual "plea agreement," such as the one in this case, which simply provides that the government will dismiss some counts and the defendant will plead guilty to others, is of no practical benefit to a defendant. The agreement creates the illusion the client is receiving some concession. This is designed to make his plea of guilty more palatable to him. It also has the incidental effect of making his attorney's activities in the case seem more valuable than they really are. It is difficult to see any virtue in this "plea bargaining" process. A defendant should decide to plead guilty because he is guilty and has no reasonable prospect of a successful defense—not because the government has made a meaningless agreement to dismiss redundant counts of the indictment.

*"(5) the time limitations imposed by the client or by the circumstances;"*

This is not a significant factor in the instant case. There were no time limitations. The conferences Mr. DeMeo had with his client and with the prosecutor could be scheduled at convenient times, and the principal expenditure of time, that involved in listening to the tape recordings, could also take place at Mr. DeMeo's convenience. At the hearing of May 12, Mr. DeMeo stated that he listened "to a tape or two each night or whenever I had a chance during the day."

*"(6) the nature and length of the professional relationship with the client:"*

This factor has no relevance to the instant case. The duration of the representation in this case argues for a low fee, not a high one. Mr. DeMeo entered the case in December 1980, and by March 16, 1981, a little over three months later, the defendant Vague had entered a plea of guilty and Mr. DeMeo's work was virtually completed. All that remained was an argument in mitigation at the time of sentencing. As lawyer-client relationships go, this was a brief one.

*"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;"*

The routine services required by this case did not call for a lawyer of outstanding experience, reputation or ability. A beginning lawyer could have handled the matter as well as Mr. DeMeo did. This is not to say that Mr. DeMeo was incompetent but simply that the case was routine.

*"(8) whether the fee is fixed or contingent."*

This element, of course, has no application to a criminal case, since disciplinary rule 2–106(c)(4) specifically prohibits contingent fee agreements in criminal cases and the fee here was fixed, not contingent.

## IS THE FEE CLEARLY EXCESSIVE?

I believe the foregoing discussion has taken into account all factors relevant to what would be a reasonable fee in this case. It is now time to apply the test of Disciplinary Rule 2–106(b) in light of these factors:

A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite conviction that the fee is in excess of a reasonable fee.

It is here that the matter becomes more subjective. What would a lawyer (or judge) of "ordinary prudence" believe to be the maximum reasonable fee in this case? The disciplinary rule sets out the relevant factors, but it does not say how *much* the lawyer is to be compensated. There is no formula given for arriving at a proper dollar amount. The profession simply has not attempted to regulate itself to that extent. Instead, we rely upon what we hope will be the good sense and the good faith of those who have been granted the privilege of representing others in legal matters. The final paragraph of former Canon 12 of the American Bar Association Canons of Professional Ethics (which was also contained in Canon 12 of the Illinois State Bar Association and the Chicago Bar Association canons) still lights the way:

In fixing fees it should never be forgotten that the profession is a branch of the administration of justice and not a mere money-getting trade.

This is the philosophy which will lead the lawyer or judge of ordinary prudence to a correct answer concerning whether a particular fee is clearly excessive. It is an *ethical* determination which must be made. It is not a business decision, not a question of what the traffic will bear, nor of how wealthy the lawyer would like to become in the least possible time. And most certainly it is not merely what Mr. DeMeo described as "... a matter between my client and myself."

Applying all the relevant factors enumerated in Disciplinary Rule 2–106(b), and bearing in mind that Mr. DeMeo's representation of the defendant Vague was not simply a business transaction but the performance of a lawyer's role in the administration of justice, it is my definite and firm conviction that an $8,000.00 fee cannot be ethically justified. That amount is clearly excessive.

The next step is to determine the maximum fee that would not be clearly excessive. Applying the DR 2–106(b) considerations, I believe $2,500.00 is the high end of the range that could be considered reasonable for the services required and actually rendered in this case. This, it will be noted, is twice what the attorney for the co-defendant McDermott charged for substantially identical services.

## IS ACTION BY THE COURT DESIRABLE?

Having determined that anything over $2,500.00 is clearly excessive, the next question is whether it is desirable for the court to do anything about the $8,000.00 fee. This is distinct from the related question of whether the court has authority to do anything, a subject to be discussed later.

There appear to be no federal rules or statutes bearing explicitly on this question. By contrast, the Illinois Supreme Court has adopted specific standards of judicial conduct, set forth in Illinois Supreme Court Rule 61. Rule 61(c)(10) (Ill.Rev.Stat. ch. 110A, § 61(c)(10)) provides:

*Unprofessional conduct of attorneys.* A judge should criticize or discipline with prudence unprofessional conduct of attorneys in matters pending before him, and if such action is not a sufficient corrective, should refer the matter to the proper authorities.

This rule is identical to the former Canon 11 of the American Bar Association Canons of

Judicial Ethics. The present ABA canon, adopted in 1973, is similar:

A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware.

ABA Code of Judicial Conduct, Canon 3(B)(3). While the Code of Judicial Conduct for United States Judges, approved by the Judicial Conference of the United States, contains no provision of this kind, it nowhere suggests a contrary view. Nor is it apparent what philosophical basis might exist for a contrary view. The propriety, indeed the necessity of judicial intervention to prevent the overreaching of litigants, and especially criminal defendants, seems inherent in the relationships involved. It is the court's own process, its power to impose criminal sanctions, that makes the client so vulnerable. It is because the client believes he needs help with the judicial process that he retains a lawyer. In this case, where a plea of guilty was the obvious course from the outset, the central purpose for which the defendant hired Mr. DeMeo was to intercede with the court on the matter of sentence.

One question suggested by the facts of this case is whether it makes any difference that the client is not complaining. Should the court act *sua sponte* in regard to excessive fees? The answer is that unless the court acts on its own motion it will not act at all in the situations which are most in need of redress. In the typical case of overcharging, the client does not realize he is being overcharged and therefore will make no complaint. That nothing would happen without the court taking the initiative is illustrated by the present case, where the client agreed to pay an excessive fee of $12,000.00 at the time he retained his lawyer. Obviously, the client did not realize the fee was excessive or he would not have agreed to pay it.

While clients occasionally do complain that the fees are too high, the complaint is usually about fees the lawyer is attempting to collect and which the client has not agreed to pay, or at least has not paid. A client who has paid the fee has acquiesced in it; rarely will he seek a refund of any portion of a fee already paid or seek relief from a fee agreement. Even when a fee dispute does arise, it is not often that the court will hear about it. The client may eventually give in and pay the fee without making a complaint to anyone, or if he does complain, it might be to a bar association rather than to the judge who heard the case.

In short, the absence of a complaint by the client is consistent with a need for action by the court, not a reason for the court to abstain from taking action.

## WHAT ACTION IS DESIRABLE?

What should be done? One possibility would be to refer the matter to the Illinois Supreme Court Disciplinary Commission, which investigates and prosecutes disciplinary cases against members of the Illinois Bar. Violation of a disciplinary rule, such as DR 2–106, subjects a lawyer to disciplinary action. DR 1–101(a), DR 1–102(a). The ultimate decision is made by the Illinois Supreme Court, which may take disciplinary action against the attorney or find that such action is not warranted.

It appears to me undesirable to divert the question of Mr. DeMeo's fee to the Illinois Disciplinary system. The fee was charged in this court, not in an Illinois court. The challenge to the administration of justice is one presented to this court, not to an Illinois court. While Mr. DeMeo's conduct may well be of concern to the Illinois disciplinary authorities, the question of whether he shall be allowed to charge an $8,000.00 fee for a case in this court should be decided by this court if it is to be decided by any court at all. See *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964), *aff'd on rehearing*, 370 F.2d 418 (9th Cir. 1966); *Black v. State of Mo.*, 492 F.Supp. 848, 874–875 (W.D.Mo. 1980).

If it is inappropriate simply to refer the question of Mr. DeMeo's fee to the Illinois disciplinary authorities, the question still arises whether action should be taken by the full court, or the Executive Committee

of the court, rather than by the individual judge who has handled the case. I have no difficulty concluding that if something is to be done, it must be done by the individual judge. I know from my experience on the court and as a member of the Executive Committee that individual judges are expected to deal with disciplinary questions which arise in particular cases before them.

I conclude that it is in the interest of justice to order that Mr. DeMeo's fee be reduced and that I should enter that order if I have the authority. This brings me to the final question of whether I do have that authority.

## DOES THE COURT HAVE AUTHORITY TO ORDER THE FEE REDUCED?

The case of *Coffelt v. Shell,* 577 F.2d 30 (8th Cir. 1978) is directly on point. During the course of a criminal trial, Judge Terry L. Shell of the Western District of Arkansas determined that the defense attorney had a conflict of interest. Judge Shell disqualified the attorney and declared a mistrial. He also determined that the $1,000.00 fee charged by Coffelt, the attorney,

> . . . was excessive in view of the early termination of the proceedings and 'Coffelt's obvious lack of preparation for trial.' The court ordered the fee reduced to $100.00 on grounds of fairness and equity.

577 F.2d at 31. Coffelt was ordered to repay his client $400.00 of the $500.00 he had already received. Coffelt appealed the order, challenging both the disqualification and the reduction of his fee. The Court of Appeals affirmed. The holding of the Court was as follows:

> "The district court bears the responsibility for the supervision of the members of its bar." *Fred Weber, Inc. v. Shell Oil Co., supra,* 566 F.2d [602] at 605, *quoting from Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975). In addition to its authority to disqualify attorneys, the court has the inherent power to inquire into the amount charged by an attorney in order to protect a client from excessive fees. *See In re Michaelson,* 511 F.2d 882, 888 (9th Cir.), *cert. denied,* 421 U.S. 978,

95 S.Ct. 1979, 44 L.Ed.2d 469 (1975); *In re Silver,* 508 F.2d 647 (9th Cir. 1974).

> In matters concerning the supervision of members of its bar, "the finding of the district court will be upset only upon a showing that abuse of discretion has taken place." *Fred Weber, Inc. v. Shell Oil Co., supra,* 566 F.2d at 605, *quoting from Hull v. Celanese Corp., supra,* 513 F.2d at 571. "Moreover, in the disqualification situation, any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp., supra,* 513 F.2d at 571.

> We conclude the district court did not abuse its discretion in disqualifying Coffelt from further representation of Gordon and in modifying Coffelt's fee arrangement with Gordon.

> Affirmed.

577 F.2d at 32. Judge Henley dissented because he believed the case should be remanded for a determination of whether Coffelt should be ". . . permitted to retain at least the $500.00 that he had received initially from Gordon" because it appeared that, subsequent to the mistrial, the conflict of interest had been eliminated. Judge Henley noted, however, that he did "not disagree with the legal principles and authorities relied upon by the majority." 577 F.2d at 32. Rehearing and rehearing *en banc* was denied.

There is no indication in *Coffelt v. Shell* that the client, Gordon, made any complaint about the fee. It seems clear that Judge Shell acted *sua sponte.*

In *Vaughn v. Califano,* 442 F.Supp. 185, 188 (E.D.Tenn.1977), a case involving a fee in a case brought under the Social Security Act, Judge C. G. Neese observed that

> . . . this Court has inherent summary jurisdiction over the attorneys practicing before it to compel the proper relationship between themselves and their clients. *Ex parte Wall* (1883), 107 U.S. 265, [271] 2 S.Ct. 569, [574] 27 L.Ed. 552, 556. This inherent power extends obviously to the control of the maximum fees received at attorneys for their representation of clients before this Court.

*In re Kuflik*, 342 F.2d 421 (2d Cir. 1965) is of interest. This was a civil case in which Judge Ryan, apparently on his own initiative, inquired into the contingent fee arrangement and ordered that the client receive the portion of the fee which otherwise would have gone to an attorney who had withdrawn from the case. The client and all attorneys involved had agreed that the attorney who withdrew would receive the portion of the fee in question. The Court of Appeals reversed the action of Judge Ryan because in its view there had been no showing of any overreaching or fraud. The significance of the case for our purposes is found in the following language of the Court:

> Among the grave responsibilities that must be shouldered by judges is that of the supervision of the administrative process of judicature lest, though it would appear that justice is done, injustice results, and we do not disapprove of the interest shown by the judge below in making inquiry into the retainer arrangements Boucher had with his lawyers.

342 F.2d at 422.

While the court in *Kuflik* did not emphasize that the fee was contingent, it is true that judicial intervention takes place most often in civil cases involving contingent fees. It is considered axiomatic that the court has the authority to regulate such fees, whether or not any complaint is made by the client. A typical expression of the court's interest in contingent fees is found in *Pocius v. Halvorsen*, 30 Ill.2d 73, 195 N.E.2d 137, 142 (1963):

> ... [I]t does not necessarily follow that under all circumstances, a contract entered into prior to, and as a condition precedent to, the creation of an attorney-client relationship can, unless influenced by actual fraud or by mistake, be enforced as written. Contingent fee contracts do have the practical effect of giving an attorney a pecuniary interest in the successful prosecution of the litigation, and, therefore, it is felt that unless absolutely fair they will adversely affect the usual attorney-client relationship. . . .
> For this reason, and because such con-

tracts sometimes lead to solicitation and otherwise bring disrepute to the law, they are closely scrutinized by the courts . . . . And this is true without regard to whether or not they are entered into during the attorney-client relationship. "A contingent fee contract is always subject to the supervision of the courts as to its reasonableness."

The theoretical basis for the court's inherent power to regulate contingent fees is discussed in F. B. MACKINNON, CONTINGENT FEES FOR LEGAL SERVICES 23 (Amer. Bar Found. 1964):

> There are two other bases for the court's action in setting or reviewing fees of members of the legal profession. In one class of cases, the court exercises its equity jurisdiction over fiduciary relations, in this case, the lawyer-client relationship. Here, the court protects the client from excessive fees charged by the lawyer because of the client's reliance on him. The other theory is apparently similar but, for purposes of our discussion, is significantly different. A court sometimes alters a fee contract it regards as exorbitant which was signed under circumstances which indicated no reliance by the client on the lawyer to protect his interest and thus no basis for traditional equity jurisdiction. Rather, the court is exercising its special power over activities of members of the bar. Courts view such intervention to prevent unprofessional overreaching by the lawyer as an adjunct of their power to admit, expel, and discipline those who seek to practice before them. It is under this power that certain New York courts have recently set up a sliding scale of contingent fees to be charged in personal injury cases.

\*     \*     \*     \*     \*     \*

A similar examination of individual contingent fee contracts is sometimes based on the exercise of a court's power to police the professional conduct of lawyers who practice before it. *Presumably, contracts for a fixed, certain fee would be subject to the same examination*, but it is

those which are speculative that are more likely to be questioned after the event. It was under this general disciplinary power that some New York courts adopted the rules referred to above.

(Emphasis added). *Id.* at 44.

As suggested in the foregoing quotation from MacKinnon, the rationale for inquiring into contingent fees would seem to apply equally to fees for a fixed amount. The reason contingent fees come under scrutiny more often is that they have greater potential for excessiveness. But it is the fact that overreaching is involved, not the fact that the fee is contingent, that justifies action by the court. Similarly, there is no reason to distinguish between a civil case and a criminal case. It would make no sense to say that the court has power to prevent the exploitation of litigants in civil cases but not in criminal cases.

## CONCLUSION

I have found no authority which suggests a lack of power in the court, *sua sponte*, to order an attorney to reduce an excessive fee in a criminal case. On the contrary, the foregoing authorities furnish ample support for such action. In the circumstances, the interests of justice require that this authority be exercised.

Mr. DeMeo is hereby ordered to return to Steven Vague or Steven Vague's father, within 30 days, all sums in excess of $2,500.00 which the Vagues have paid for Mr. DeMeo's services in this case. On or before September 14, 1981, Mr. DeMeo shall file with the court a receipt or other written evidence that such repayment has been made. Failure to comply with this order will result in the issuance of a rule to show cause.