**Arlie G. SKELTON, Jr., et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Josephine NEWTON, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Nos. 79 C 1243, 80 C 2151.**

United States District Court, N.D. Illinois, E.D.

Feb. 11, 1987.

---

Lowell E. Sachnoff, Barry S. Rosen, Jeffrey A. Schumacher, Sachnoff Weaver & Rubenstein, Ltd., Chicago, Ill., Beverly C. Moore, Jr., Law Offices of Beverly C. Moore, Jr., Washington, D.C., Jack Corinblit, Marc Seltzer, Corinblit & Seltzer, Los Angeles, Cal., Francis Goodman, Law Offices of Francis Goodman, Chicago, Ill., Robert S. Schachter, Zwerling Schachter & Zwerling, Jonathan Plasse, Goodkind Wechsler Labaton & Rudoff, New York City, Charles A. Boyle, Charles A. Boyle & Associates, Abraham N. Goldman, Abraham N. Goldman & Associates, William J. Harte, William J. Harte, Ltd., Chicago, Ill., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

In these consolidated class actions, the plaintiffs sued General Motors Corporation ("GM") for damages stemming from GM's installation of THM 200 transmissions into automobiles which allegedly required a THM 350 transmission. The parties entered into a comprehensive settlement agreement, which this court has approved in a separate order entered on this date.[1] The settlement order did not determine the appropriate award of attorneys' fees for class counsel. The court has received fee petitions from nine law firms requesting attorneys' fees in connection with this action.[2] The class counsel seeks an aggregate "lodestar" amount of $3.3 million, and a 1.75 multiplier. The total fees and expenses requested amount to approximately $5.9 million.

After consideration of all the facts and circumstances, including reviewing the very extensive briefs and petitions and conducting a hearing on November 10, 1986, the court finds that the amounts set forth

William R. Jentes, Garrett B. Johnson, James A. Langan, Kirkland & Ellis, Chicago, Ill., Louis H. Lindeman, Jr., General Motors Corp., Detroit, Mich., for defendant.

1. The settlement dismisses the following actions: *Skelton v. General Motors Corp.,* No. 79 C 1243 ("*Skelton*"); *Newton v. General Motors Corp.,* No. 80 C 2151 ("*Newton*"); *Fritz v. General Motors Corp.,* No. 85 C 4805 ("*Fritz*"); *Morgan v. General Motors Corp.,* No. 81 Civ 0280 (S.D.N.Y.) ("*Morgan*"); and *Attard v. General Motors Corp.,* No. 21558/79 (Supreme Court of the State of New York) ("*Attard*").

2. The fee petitioners are Charles A. Boyle & Associates, Ltd.; Corinblit & Seltzer; Abraham N. Goldman & Associates, Ltd.; Goodkind, Weschler, Labaton & Rudoff; Francis E. Goodman, P.C.; William J. Harte, Ltd.; Law Offices of Beverly C. Moore, Jr.; Sachnoff, Weaver & Rubenstein, Ltd.; and Zwerling, Schacter and Zwerling.

below provide the appropriate compensation for class counsels' efforts in this litigation.

The court has reduced both the hours and attorney fee rates sought by all attorneys for the reasons set forth in this opinion. However, in this court's opinion, the court has allowed reasonable hours and reasonable attorney fee rates so that all counsel shall be properly compensated for their legal efforts in the consolidated cases. The court's determination of the reasonable hours and rates for each fee petitioner is set forth at the end of this opinion.

### Procedural History

This litigation originated in the *In re General Motors Engine Interchange Litigation,* MDL No. 308 (N.D.Ill.), *rev'd,* 594 F.2d 1106 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), *aff'd after remand,* 620 F.2d 1190 (7th Cir.1980) (the *"Engines"* case). In *Engines,* the plaintiffs alleged that GM violated the written warranty provisions of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301–2312, by substituting different engines and other automotive parts, including transmissions, into certain lines of GM automobiles. Specifically, the *Engines* plaintiffs complained that GM had installed Chevrolet engines in 1977 Oldsmobiles, and THM 200 transmissions in automobiles which were supposed to be equipped with a THM 350 transmission. *See Engines,* 594 F.2d at 1114, 1132, n. 44. On remand, Judge McGarr, who presided over the *Engines* litigation, separated the transmissions claims, and ruled that the case would proceed only on the engine interchange issues.

In response to Judge McGarr's decision, plaintiffs filed the *Skelton* action on March 29, 1979. An amended complaint was filed two months later. Although the *Skelton* complaint was patterned after the written warranty claims in the *Engines* litigation, it also contained allegations of deceptive warranties and breach of implied warranties. The *Newton* claims were filed approximately one year after *Skelton,* and alleged a different theory of liability stemming from GM's substitution of the THM 200 transmission. These plaintiffs alleged that GM's conduct in replacing the THM 350 transmission with a THM 200 transmission violated the implied warranty provisions contained in UCC § 2–314(2)(c) because the substituted transmissions were not "fit for their ordinary purpose."

During approximately the same time frame, two other groups of plaintiffs instituted similar litigation in New York. The *Attard* action was filed in New York state court in 1979, and the *Morgan* action was filed in the New York federal district court in 1981. These complaints alleged that GM's conduct constituted a breach of its implied and express warranties in violation of the UCC and the Magnuson-Moss Warranty Act.

In 1979, GM moved to dismiss the *Skelton* complaint, which was then pending before Judge John Powers Crowley. The case was transferred to Judge Moran, and the parties rebriefed the pending motion to dismiss. On October 1, 1980, Judge Moran issued an opinion which upheld plaintiffs' written warranty claim, and dismissed the implied warranty and defective warranty claims. *Skelton v. General Motors Corp.,* 500 F.Supp. 1181, 1190–95 (N.D.Ill. 1980). GM filed an interlocutory appeal, which was accepted by the Seventh Circuit. While *Skelton* was on appeal to the Seventh Circuit, the *Skelton* plaintiffs amended their complaint to include the *Newton* merchantability claims, and GM filed a motion to dismiss all the remaining *Skelton* and *Newton* claims.

In September of 1981, the Seventh Circuit issued its opinion in *Skelton,* reversing Judge Moran's recognition of a written warranty claim based on GM's substitution of the THM 200 transmissions for THM 350 transmissions. *Skelton v. General Motors Corp.,* 660 F.2d 311 (7th Cir.1981). The Seventh Circuit denied plaintiffs' request for a rehearing and rehearing en banc on December 11, 1981; and the Supreme Court subsequently denied plaintiffs' petition for certiorari. *Skelton v. General Motors Corp.,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982).

The *Skelton* and *Newton* plaintiffs filed a consolidated complaint under Magnuson-Moss shortly after the Seventh Circuit issued its opinion. The cases were then transferred to Judge Getzendanner, who accepted supplemental briefs and heard oral argument on the motion to dismiss. The cases were transferred to this court a few months later. At the time of this transfer, the parties were still involved in the process of investigating and briefing issues regarding their class certification motions. This process included hiring experts, taking some depositions and responding to numerous inquiries regarding the class action.[3] In addition, due to the continuous development of the law in this area, the parties were often required to supplement their certification briefs to address the most recent decisions regarding class certification in cases of this subject and magnitude.

During this same time period, significant developments were taking place in New York and Washington, D.C. In New York, the *Attard* court denied GM's motion to dismiss, and was affirmed by the New York appellate court. Counsel proceeded with class certification motions and discovery in both *Attard* and *Morgan;* and then agreed to informally stay these proceedings pending the outcome of the *Skelton/Newton* class certification motions before this court. In Washington, GM was involved in an administrative action conducted by the Federal Trade Commission ("FTC"). The parties engaged in extensive discovery during the course of the FTC investigation, and subsequently entered into a consent decree settling the administrative action in November of 1983. This settlement, which was opposed by the *Skelton/Newton* plaintiffs, provided for the establishment of a Mediation and Arbitration program to resolve consumer complaints stemming from the operation of GM automobiles.[4]

In 1984, the *Skelton/Newton* plaintiffs suggested that the court proceed with an initial certification of a "failures" class. This court issued an interim order on December 20, 1984, which revealed the court's intent to certify a "failures" class under Count I of the complaint. The court declined to certify any other classes at that time. The court also held that state privity law was applicable to the Magnuson-Moss cause of action. *Skelton v. General Motors Corp.*, No. 79 C 1243, Slip op. at 3 (N.D.Ill. Dec. 20, 1984). In addition, it denied GM's motion to dismiss plaintiffs' label and latent defect claims (Counts III and IV of the consolidated complaint). *Id.*

The parties began discussing the possibility of settlement following the issuance of this interim order. These discussions extended throughout 1985, and included conferences both in and out of court. After extensive negotiations, the parties reached a general agreement in December of 1985. They expended considerable time negotiating and drafting the final provisions of this agreement, which were presented to the court on June 16, 1986. The Agreement encompasses the following class of plaintiffs:

All original owners (other than solely for purposes of resale) of a General Motors 1976–1980 model year vehicle equipped with a THM 200 transmission purchased in the United States, its possessions and territories, or the District of Columbia, who incurred any transmission repair expense within the first 50,000 miles of use of that vehicle.

In this settlement, GM agreed to establish a $17 million fund which will provide reimbursement for transmission service and repair costs incurred by plaintiffs in the "failures" class.[5] The parties agreed

---

**3.** The Magnuson-Moss Warranty Act, which provided federal jurisdiction, contains a one-hundred plaintiff rule for class actions instituted pursuant to its provisions. 15 U.S.C. § 2310(d)(3)(C). This unique requirement necessitated considerable expenditures of time both before and after this court's order certifying the "failures" class.

**4.** This Mediation and Arbitration Board, which operates in conjunction with the Better Business Bureau, has awarded over $30 million to aggrieved consumers since its inception in 1983.

**5.** The settlement agreement also provides for an additional $2.5 million to be deposited by GM in

that the fund would be the only source of any attorneys' fees sought by plaintiffs' counsel, and that plaintiffs' counsel would not seek a fee award calculated on a percentage-of-recovery basis. In accordance with this agreement, plaintiffs' counsel have submitted timesheets and expense reports which reflect the hours of work devoted to this litigation.

### Motion For Attorneys' Fees

Initially, the court must determine the source of its authority to award attorneys' fees in this action. The class counsel argues that fees should be awarded under the "common fund" doctrine, which permits an award of attorneys fees where a litigant or his attorney recovers a common fund for the benefit of persons other than himself or his client. *See generally Boeing v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In contrast, GM argues that these fee petitions should be scrutinized under the attorneys' fee provision set forth in the Magnuson-Moss Warranty Act[6] and the Supreme Court and Seventh Circuit caselaw pertaining to statutory fee awards. *See generally Pennsylvania v. Delaware Valley Citizens' Council,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646 (7th Cir.1985).

In the court's view, the plaintiffs have exaggerated the difference between calculating fees pursuant to the common fund doctrine as opposed to a statutory fee provision. An award of fees under the common fund doctrine is an equitable practice which "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing*, 444 U.S. at 478, 100 S.Ct. at 749. The doctrine enables the court to offset this inequity "by assessing fees against the entire fund, thus spreading fees proportionately among those benefitted from the suit." *Id.* In addition to this unjust enrichment rationale, the common fund doctrine also contains an "incentive" rationale: by permitting an award of fees in these cases, the doctrine operates to encourage attorneys to engage in litigation which benefits certain groups of people who could not otherwise obtain representation for their interests. *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 255, 262 (N.D.Ill.1979); *Arenson v. Board of Trade*, 372 F.Supp. 1349, 1356 (N.D.Ill.1974); *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 614 (D.Colo.1974). *See* Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 476 (1981).[7] Although statutory fee awards are not based on an unjust enrichment principle, they contain the same "incentive" rationale as the common fund doctrine. *Pennsylvania v. Delaware Valley Citizens Council*, 106 S.Ct. at 2098 ("the aim of [fee-shifting] statutes [is] to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws."). *See* Leubsdorf, *supra*, at 477.

■ Given this commonality of purpose, this court finds that the standards for determining reasonable attorneys fees in common fund cases and statutory fee cases

---

the event that the plaintiffs' claims deplete the $17 million already deposited.

6. This section provides:
 If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.
 15 U.S.C. § 2310(d)(2).

7. *See generally* Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation*, 88 Harv. L.Rev. 849 (1975); Dawson, *Attorneys and Involuntary Clients: Attorney Fees From Funds*, 87 Harv.L.Rev. 1597 (1974).

should not be significantly different.[8] In the court's view, the use of statutory fee guidelines to determine a proper fee award is especially relevant where the litigation is commenced and prosecuted under a federal statute which specifically provides for an award of attorneys' fees. When parties settle a case involving statutory fees, the amount ultimately awarded should not be dependent upon whether the fees are assessed directly against the defendant, or against a fund created by the defendant. *See* Leubsdorf, *supra,* at 489. Thus, although there may be theoretical distinctions between the common fund doctrine and statutory fees, these distinctions are not so great that they justify the use of completely different standards when calculating an award of attorneys' fees in a particular case.[9]

Furthermore, regardless of any theoretical distinctions between common fund and statutory fee cases, the courts in this circuit employ the same general standards to calculate attorneys' fees in both types of cases. In *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), a Title VII case, the court adopted the guidelines for attorneys' fees set forth

in Rule 2–106 of the Code of Professional Responsibility:

1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly;

2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

3) Fees customarily charged in the locality for similar legal services;

4) The amount involved and the results obtained;

5) Time limit imposed by the client or the circumstances;

6) The nature and length of the professional relationship with the client;

7) The experience, reputation and ability of the lawyer or lawyers performing the services; and

8) Whether the fee is fixed or contingent.[10]

The courts in this circuit have reiterated these factors in both common fund and statutory fee cases. *See, e.g., Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1249 (7th Cir.1982) (antitrust); *Loctite Corp. v. Fel-Pro, Inc.,* 667 F.2d 577, 585 (7th Cir.1981) (patent); *Mills v. Eltra,*

---

**8.** *See* Federal Judicial Center, Attorneys' Fees in Class Actions 4–11 (1980) (discussing the considerations for awarding attorneys' fees without mentioning a distinction between fund cases and statutory fee cases).

**9.** If anything, the distinction between common fund fee awards and statutory fee awards may justify heightened judicial scrutiny because the fee will be paid out of a fund in which the defendant has only a contingent interest, and the plaintiffs' attorneys' interests conflict with the interests of the fund's beneficiaries. A recent discussion of the distinctions between common fund and statutory fee awards has suggested that the nature of a common fund award may actually necessitate greater judicial scrutiny of the fee petitions. Third Circuit Task Force, *Court Awarded Attorney Fees,* 15 (October 8, 1985). *See also City of Detroit v. Grinnell,* 495 F.2d 448, 469 (2d Cir.1974), where the court noted:

> Courts must always heed the admonition of the Supreme Court in *Trustees v. Greenough* [105 U.S. (15 Otto) 527, 536, 26 L.Ed. 1157 (1881)] when it advised that fee awards under

the equitable fund doctrine were proper 'if made with moderation and a jealous regard to the rights of those interested in the fund.' The Third Circuit Task Force recommends a specific procedure in common fund and statutory fee cases; however, this procedure—which involves a percentage fee arrangement—is impossible in this case because the plaintiffs have agreed not to seek fees based on such a calculation.

**10.** These factors were routinely used in common fund cases long before the advent of statutory fee provisions. *See In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, 255–56 (N.D. Ill.1979) (tracing articulation of these standards to *In re Osofsky,* 50 F.2d 925, 927 (S.D.N.Y. 1931)). More recently, the Seventh Circuit has indicated that use of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), is appropriate. *Lynch v. City of Milwaukee,* 747 F.2d 423, 427 (7th Cir.1984). These factors are similar to the factors cited in the Code of Professional Responsibility. *Johnson,* 448 F.2d at 719; *Lynch,* 747 F.2d at 427.

663 F.2d 760, 762 (7th Cir.1981) (common fund); *Muscare v. Quinn,* 614 F.2d 577, 579 (7th Cir.1980) (42 U.S.C. § 1988); *Gross v. Schweiker,* 563 F.Supp. 260, 262 (N.D. Ind.1983) (EAJA 28 U.S.C. § 2412); *Kennedy v. Nicastro,* 546 F.Supp. 267, 270 (N.D. Ill.1982) (shareholders' derivative action); *Zilker v. Klein,* 540 F.Supp. 1196, 1199 n. 8 (N.D.Ill.1982) (shareholders' derivative action); *United States v. Vague,* 521 F.Supp. 147, 152 (N.D.Ill.1981) (criminal); *Will v. United States,* 90 F.R.D. 336, 338 (N.D.Ill. 1981) (common fund); *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, 255–56 (N.D.Ill.1979) (common fund). *See also* In re Warner Communications Securities *Litigation,* 618 F.Supp. 735, 746–47 (S.D.N.Y.1985); *Phemister v. Harcourt-Brace Jovanovich, Inc.,* 1984–2 Trade Cases ¶ 66,234 at 66,995 (N.D.Ill.1984); *In re Cenco Inc. Securities Litigation,* 519 F.Supp. 322, 325–26 (N.D.Ill.1981); *In re Clark Oil Antitrust Litigation,* 422 F.Supp. 503, 511 (E.D.Wis.1977); *Liebman v. Peterson Coal & Oil Co.,* 63 F.R.D. 684 (N.D.Ill.1974) (discussing similar factors in determining fee awards from common fund). Not all factors apply in a given case,[11] and no one factor is controlling.[12]

As the first factor indicates, the starting point in the court's analysis involves a determination of the number of hours reasonably expended on the litigation. This figure is then multiplied by the fees customarily charged in the locality for the services rendered to produce the "lodestar" figure. *Waters,* 502 F.2d at 1322. *See also Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *In re Cenco Inc. Securities Litigation,* 519 F.Supp. 322, 325–26 (N.D.Ill.1981). After calculating the lodestar, the court may add an upward adjustment, or multiplier, to ensure that the fee award provides appropriate compensation to the plaintiffs' counsel for the work performed and the results achieved. GM has filed specific objections

to the nine sets of timesheets submitted by plaintiffs' counsel. The court will discuss these objections in its review of the individual petitions, *infra.* Before launching into a discussion of the individual petitions, however, the court will address several recurring objections to the majority of the petitions.

## 1. Time Spent on Alleged "Lost" and "Abandoned" Claims

GM argues that the hours claimed by plaintiffs' attorneys should be reduced to account for the unsuccessful appeal to the Seventh Circuit in *Skelton* and the claims allegedly abandoned in the course of the settlement negotiations. In *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), the Supreme Court held:

> work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' *Davis v. County of Los Angeles,* 8 E.P.D. [¶ 9444], 5049 [C.D.Cal.1974]. The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

Following this language in *Hensley,* GM asserts that plaintiffs' attorneys Boyle, Harte, Goodman and Goldman are not entitled to any fees or expenditures in connection with the *Skelton* claims dismissed by the Seventh Circuit in *Skelton v. General Motors Corp.,* 660 F.2d 311 (7th Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1983), and urges this court to disallow any fees for the time spent briefing the motions to dismiss before Judge Moran, the appeal to the Seventh Circuit, and the subsequent petition for certiorari.

---

**11.** In the court's opinion, the second, fifth and sixth factor have little, if any, relevance to the request for fees in this case.

**12.** In addition, since several of these factors may overlap, the determination of one factor may also resolve issues pertaining to another

factor. For instance, the calculation of an hourly rate usually reflects the fees charged in a locality (factor three), and the experience, reputation and ability of the attorneys performing the services (factor seven).

■ Plaintiffs' counsel assert that the *Hensley* standards are inapplicable to fee awards under the common fund doctrine, which permits reimbursement for all fees expended in the creation of a common fund. This position exaggerates the distinctions between statutory and common fund fee awards. As stated earlier, the courts in this circuit apply the same criteria when determining awards for statutory fees and fees from a common fund. The common fund doctrine, like the statutory fee provisions, also instructs the court to analyze the fee petition to determine whether the plaintiffs "prevailed" on certain claims, and whether the time expended contributed to the ultimate favorable resolution of the case. *See e.g., Swanson v. American Consumer Industries,* 517 F.2d 555, 563 (7th Cir.1975) (the fact that a plaintiff did not prevail on certain issues is entitled to weight in the determination of an appropriate fee award). *Kennedy v. Nicastro,* 546 F.Supp. 267 (N.D.Ill.1982); *Zilker v. Klein,* 540 F.Supp. 1196, 1198–99 (N.D.Ill.1982); *In re Penn Central Securities Litigation,* 416 F.Supp. 907, 917 (E.D.Pa.1976), *rev'd on other grounds,* 560 F.2d 1138 (3d Cir. 1977). Accordingly, the court finds that the *Hensley* guidelines for assessing fees in statutory fee cases are equally relevant to a determination of fees under the common fund doctrine.[13]

■ Regardless of the analysis employed, however, the court finds that exclusion of all the time expended on the *Skelton* claims would be improper. The Seventh Circuit recently discussed *Hensley*'s limitation of fees to those reasonably expended on "prevailing" claims in *Zabkowicz v. West Bend Co.,* 789 F.2d 540 (7th Cir.1986). In *Zabkowicz,* the plaintiff filed a sexual harassment suit under Title VII which also contained pendent tort claims stemming from the alleged discriminatory conduct. The district court found that the defendants had violated Title VII, but it denied plaintiffs' request for attorneys'

fees in its entirety because the hours were excessive and failed to distinguish between the time spent on the Title VII claim and the time spent on the state law claims. On appeal, the Seventh Circuit reversed, holding that the district court should consider the lawsuit as a whole, and take into account the interrelated nature of the various claims in the case when determining an appropriate fee award for a prevailing plaintiff. *Zabkowicz,* 789 F.2d at 551. The court instructed:

> Where several claims arise out of a common factual core or are based on related legal theories, separating 'out the legal services rendered with respect to these overlapping claims would be an exercise in futility.' In accordance with *Hensley,* we believe that prevailing plaintiffs may be entitled to compensation for time expended on such related claims.

*Id.* (citation omitted).

The *Zabkowicz* court explained that the next inquiry involves whether the plaintiff's unsuccessful claims are sufficiently related to the successful claims to justify an award of attorneys' fees. It held:

> *Hensley* provides no precise method for determining whether claims are related or unrelated. Nonetheless, a 'useful tool for making this determination is to focus on whether the claims seek relief for essentially the same course of conduct.' ... From this perspective, 'an unsuccessful claim will be unrelated to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.'

*Id.* (citations omitted). In order to determine whether the claims were sufficiently related, the court examined each claim separately. It found that, "although these claims are based on distinct legal theories, they undeniably involve a common core of

---

13. The guidelines for assessing statutory fees originated in the standards commonly used to assess the reasonableness of a petition seeking fees from a common fund. *See supra* note 9. *See also In re Fine Paper Antitrust Litigation,* 751

F.2d 562, 583 n. 19 (3d Cir.1984); *Prandini v. National Tea,* 557 F.2d 1015 (3d Cir.1977); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470–71 (2d Cir.1974); *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, 255–56 (N.D.Ill.1979).

facts. The tort claims sought to remedy the same course of conduct that gave rise to the Title VII claims." *Id.* Accordingly, the Seventh Circuit remanded the question of attorneys' fees to the district court, finding that the plaintiff may be entitled to the entire amount of her fee claim, depending upon the "significance of the overall relief obtained ... in relation to the hours reasonably expended on the litigation." *Id.* (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940).

Following *Zabkowicz*, the court finds that wholesale exclusion of the time expended on the Seventh Circuit appeal and petition for certiorari is not warranted in this case. *See Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir.1987) (rejecting defendant's "mechanical claim-chopping approach" to attorneys' fees). These claims alleged the same improper conduct and sought the same remedy ultimately provided in the settlement agreement. In *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564, 576 (7th Cir.1983), the court held:

> If, ... the plaintiff has asserted unsuccessful claims related to the successful claims by a 'common core of facts' or that are based on 'related legal theories,' ... time spent on these related but unsuccessful claims should not automatically be excluded in arriving at a reasonable attorney's fees award. Instead, the court [should] focus on the overall results obtained to determine whether it should compensate the plaintiff for the hours spent on the related but unsuccessful claims. Generally, if the results obtained are excellent, the '[plaintiff's] attorney should recover a fully compensatory fee,' which will '[n]ormally ... encompass all hours reasonably expended on the litigation....' If the plaintiff has achieved only partial success, however, compensating the plaintiff for all hours expended on the litigation may be excessive. In such a situation, the court may adjust the award either by identifying specific hours that should be eliminated

or by simply reducing the overall award to reflect the plaintiff's limited success. citing *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Thus, although a reduction may be appropriate to reflect the reasonableness of this time in light of the relief ultimately obtained,[14] the court rejects GM's argument that all of this time must be excluded from consideration when determining the proper fee award. *See also Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir.1987) (where a lawyer "presents a congeries of theories each factually and legally plausible, he is not penalized because some, or even all but one, are rejected, provided that the one or ones that succeed give him all that he reasonably could have asked for."); *Ramos v. Lamm*, 713 F.2d 546, 556 (10th Cir.1983) (reduction for lost claims may not be necessary if plaintiffs' claims involve a common core of facts or are based on related legal theories); *Monroe v. United Air Lines, Inc.*, 565 F.Supp. 274, 285–86 (N.D. Ill.1983) (allowing fees for an unsuccessful preliminary injunction where the plaintiffs ultimately prevailed in the litigation).

GM also seeks a reduction in hours to reflect the fact that plaintiffs relinquished some claims during the course of the settlement agreement. The foregoing discussion applies with equal or greater force to these so-called "abandoned" claims. Basically, to oversimplify, all of these claims involve different theories to redress the same wrong—GM's placement of THM 200 transmissions into automobiles requiring THM 350 transmissions. In *Zabkowicz*, the Seventh Circuit recognized that, when a plaintiff voluntarily dismisses a claim as part of a settlement vindicating his rights, a fee award based on all the plaintiffs' claims may be appropriate. *Zabkowicz*, 789 F.2d at 552. In the present case, the court never ruled on the remainder of the plaintiffs' petitions for class certification, and it denied GM's motions to dismiss. Plaintiffs' counsel should not be penalized just because they relinquished some claims in order to reach a comprehen-

---

**14.** The court has made some adjustments to reflect the relationship between these hours and the settlement agreement.

sive settlement agreement with GM. *See Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983). Accordingly, the court rejects GM's assertion that the fee award should be decreased to reflect the plaintiffs' dismissal of related claims in the course of the settlement negotiations.

■ As a corollary to the arguments regarding the "lost" and "abandoned" claims, GM argues that the fee award should be reduced significantly to reflect the disparity between the relief sought and the recovery obtained in the settlement agreement. Although the plaintiffs did not obtain relief on behalf of all the classes originally designated in the complaints, this does not diminish the very significant recovery obtained by class counsel in their pursuit of this litigation. As with any claim involving an area of uncharted law, plaintiffs were required to develop alternate theories for GM's liability. This involved formulating innovative arguments to convince the court of the viability of pursuing these claims as a class action, and presenting the court with sufficient authority to defeat GM's vigorous and able efforts to dismiss the litigation. Counsel's very substantial efforts in this regard have not gone unrewarded. Through their efforts, millions of consumers across the country will be able to obtain reimbursement for costs incurred in attempts to repair their THM 200 transmissions.

GM seeks to diminish the nature of plaintiffs' undertaking and the level of their success. The record in this case and the size of the settlement fund illustrate the substantial benefits that plaintiffs' counsel have conferred on the class. They achieved class certification in a nationwide Magnuson-Moss warranty action, and successfully defeated GM's repeated efforts to decertify the class and dismiss the case. Although they cannot claim direct credit for the settlement of the FTC action, it is a fair inference that the pendency of these cases had some effect on the willingness of GM to enter the consent decree with the FTC. This agreement provided relief to putative members of the class through the creation of a Mediation and Arbitration panel.

Finally, the terms of the June 16, 1986 settlement agreement between GM and the plaintiffs clearly demonstrate the significant benefits that the class counsel achieved for many members of the class. In *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983), the court recognized that

> Although some settlement agreements may be structured so that they dispose of the original claims in a way that allows the court to decide whether a particular claim has been ultimately successful or unsuccessful, this will not always be the case. Indeed, many settlements will be informally structured with an eye toward the achievement of overall objectives, rather than the disposition of discrete claims. With these more general settlements, the analysis in *Hensley* regarding successful and unsuccessful claims may be unworkable, although the central teaching of *Hensley* will still apply. That teaching is that in every case the court must explicitly consider whether the fee is a reasonable one in light of the level of the plaintiff's success.

This case clearly presents a situation where the settlement was "structured with an eye toward the achievement of overall objectives." Following the Seventh Circuit's instruction in *Illinois Welfare Rights,* this court will focus on the reasonableness of the fees, and will not reduce the award merely because the recovery obtained is less than that requested at the outset of the litigation.

### 2. Time Spent on Class Certification Motions

■ GM objects to the time expended on the motions for class certification, which, by GM's calculation, surpasses 3200 billable hours. According to GM, this figure is comprised of excessive "read and review time" and "conference" time between the various sets of plaintiffs' counsel. Although this 3200 figure appears excessive when considered in the abstract, the court finds that the procedural history of this case and the complex nature of this suit

justifies the great majority of the hours claimed on the class certification motions (the court has made some reduction in hours for excessive review and conference time and other time of little benefit to the result achieved). By operation of the local rules of court, five district court judges presided over this litigation between 1978 and 1982.[15] The necessary process of familiarization which accompanied each transfer to a new judge required some duplication of effort beyond the control of the class counsel. Each transfer necessitated some new briefing and updating of the class certification motions. The class counsel should not be penalized for the so-called "duplicative" hours spent familiarizing transfer judges with the background of a case and its pending motions. The complicated nature of this lawsuit, the extraordinary size of the class, and the uncertainty and continuing evolution of the law in this area also demanded a significant expenditure of time. Most of the time spent briefing and updating these motions was necessary and well-invested, and ultimately persuaded the court to certify at least one class of plaintiffs and to deny GM's motion to dismiss. Accordingly, the court finds that an overall general reduction in fees for excessive briefing is not warranted in this case.[16]

### 3. Staffing at Court Appearances

■ GM also accuses plaintiffs' counsel of overstaffing at court appearances by providing several lawyers at some hearings where one or two lawyers would suffice. GM refers to several hearings to illustrate this objection. In general, the courts are reluctant to allow compensation for an abundance of attorneys appearing on a routine matter. *See, e.g., In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 579 (3d Cir.1984); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1307 (E.D.N.Y.1985); *In re Continental*

*Illinois Securities Litigation,* 572 F.Supp. 931, 933 (N.D.Ill.1983); *United States v. Allen,* 578 F.Supp. 468, 483 (W.D.Wis. 1982). Where an attorney appears at a hearing as a "spectator" rather than a participant, he should not be compensated for his time in court because his presence does not materially advance the progress of the litigation. *See In re Fine Paper,* 751 F.2d at 579. If the circumstances of the hearing require the presence of more than one attorney, however, then the court should allow attorneys' fees to all necessary participants in the hearing.

■ Although this court has presided over these cases only since May, 1982, it disagrees with GM's characterization of plaintiffs' alleged "overstaffing" at court appearances. These cases were not consolidated until late 1981. Prior to the consolidation, the counsel for *Skelton* and *Newton* had to appear separately because they had separate clients and were advancing different theories of recovery. Each transfer of the case necessitates an appearance by group counsel before the new transferee judge to familiarize the judge with the attorneys and the issues in the case. The number of attorneys which have appeared before this court between 1982 and 1986 has never seemed excessive to this court. For the most part, the attorneys who have appeared in the last four years actively participated in the hearings and contributed to the advancement of the litigation. (The defendant has routinely been represented by two lawyers at court appearances.) This court has not observed excessive attendance by counsel which would justify a decrease in the hours allowed. Accordingly, the court finds that the requested reduction for overstaffed court appearances is not warranted in this case.

### 4. Travel Time

■ GM also objects to class counsel billing full rates for time spent travelling to

---

**15.** The docket reflects the following chronology: Judge McGarr (1977–1979) (part of *Engines*); Judge Crowley (1979–1980); Judge Moran (1980–1982); Judge Getzendanner (May 1982— September 1982); Judge Nordberg (September 1982 to present).

**16.** The court has discussed individual instances of excessive billing in its section addressing the individual petitions. Even if some excesses did occur, they were not so rampant as to justify GM's request for an across-the-board reduction in fees.

other cities in pursuit of this litigation. With the exception of the Zwerling and Goodkind petitions, the fee petitions do not clearly delineate the hours that they seek to charge the fund for time spent on a plane or some other means of transportation. When questioned about the amount of in-flight time charged, plaintiffs' counsel admitted that they charged for time spent in transit, but only if that time was actually spent working on the case. However, they did indicate that they were usually working on the case while in transit. It is this court's experience that cramped working conditions, limited access to materials, frequent interruptions, and inevitable distractions render travel time much less productive than other time spent on a case. Accordingly, the court has reduced the hours claimed for travel to and from a given destination by 50%. *See Orshan v. Macchiarola,* 629 F.Supp. 1014, 1020 n. 3 (E.D. N.Y.1986); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1349 (E.D.N.Y.1985); *Society for Goodwill to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998 (E.D.N.Y.1983).[17]

### 5. Attorney Fee Rate

When attorneys undertake to represent a class, their fees are usually contin-

gent on the success of the class action, and they may not be paid for their efforts until several years after the action is commenced. This results in the loss of both the use and some of the value of money, thus prompting counsel to seek an adjustment for interest and inflation. In order to account for the effects of this delay in payment, the courts in this circuit generally allow an attorney to submit his entire fee request calculated in accordance with his current rate, which provides a rough approximation for the effects of delay. *See, e.g., Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 764 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Gautreaux v. Pierce,* 690 F.2d 601, 612 (7th Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *Coleman v. Frierson,* 607 F.Supp. 1578, 1581 (N.D.Ill.1985); *Phemister v. Harcourt Brace Jovanivich, Inc.,* 1984–2 Trade Cases ¶ 66,234 at ¶ 66,996 (N.D.Ill. 1984).[18] *See also Ramos v. Lamm,* 713 F.2d 546, 555 (10th Cir.1983); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1310 (E.D.N.Y.1985).

In the present case, seven of the nine petitioners have requested fees at their current rates. The Sachnoff, Weaver firm

**17.** Some courts in this circuit have indicated that full compensation for travel may be appropriate. *See Henry v. Webermeier,* 738 F.2d 188, 194 (7th Cir.1984); *Chrapliwy v. Uniroyal, Inc.,* 509 F.Supp. 442, 454–55 (N.D.Ind.1981), *aff'd in relevant part,* 670 F.2d 760 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). The court acknowledges that a complete reduction in travel time is too harsh; however, it finds that travel time should be reduced to reflect the fact that, because of travel demands and inevitable distractions, these hours are not as beneficial or productive as time spent at the office or in court. *Society for Goodwill to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998 (E.D.N.Y.1983); *Ryan v. Raytheon Data Systems Co.,* 601 F.Supp. 243, 256 (D.Mass.1985). These reductions are set out in more detail in the discussion of the individual petitions.

**18.** In *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 776 F.2d 646, 663 (7th Cir.1985), the Seventh Circuit acknowledged that a district court could compensate for the delay in payment by using current rates, but it was not required to do so. *See also Chrapliwy v. Uniroy-*

*al, Inc.,* 670 F.2d 760, 764 n. 16 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2328, 77 L.Ed.2d 1315 (1983). The *Ohio-Sealy* litigation spanned over fifteen years, and the trial court declined to employ current rates because it determined that current rates would produce a windfall to the plaintiff's attorneys. The Seventh Circuit affirmed the refusal to use current rates, noting that "[w]hen a case lingers on for a long time, ... using current hourly rates may produce a windfall for the plaintiff since changes in hourly rates reflect not only inflation but also an attorney's increased experience and skill." *Id.* at 663. GM relies on this language to argue that the use of current rates will result in a windfall to class counsel in the present case. This court disagrees. This litigation spanned a period of seven years, which witnessed periods of very high inflation. Calculating all fees at or near current rates adequately offsets the loss generated by the delay in payment in this case. *See Chrapliwy v. Uniroyal, Inc.,* 509 F.Supp. 442, 457–58 (N.D.Ind.1981), *aff'd in relevant part,* 670 F.2d 764 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (affirming calculation of fees at current rates for litigation spanning eight year period).

and the firm of Charles A. Boyle seek fees at their historic rates, plus interest calculated at the prime rate for a given time period. Calculation of fees pursuant to this method produces significantly higher fees than those obtained by using the firms' current rates.[19] Following the procedure generally accepted in this Circuit, the court finds that in this case the calculation of reasonable fees on a current basis properly compensates all petitioning attorneys for the delay in payment in this case.

In calculating on a current basis the reasonable fee rate to be allowed each attorney in this case, the court took into account all relevant factors, including the benefit to the class, the skill and the difficulty of the legal work completed, time reasonably required and duplication of efforts, current fee rates charged by the lawyer for similar services, current fee rates customarily charged in the locality for similar legal services, the amount involved and results obtained, the experience, reputation, and legal ability of each lawyer, the difficulties in dealing with such a large class of claimants, and the contingency of the fee. The court is mindful of the chilling effect on future consumer class actions that might result from failure to adequately compensate counsel for their efforts in this litigation.

### The Individual Petitioners

### Charles A. Boyle & Associates Ltd.

■ Boyle requests compensation for 1764.80 hours at $200/hr. GM has four basic objections to Boyle's petition for fees. First, it argues that the time spent on the losing *Skelton* appeal should be eliminated in its entirety. As this court explained

above, however, plaintiffs may still seek compensation for the time spent on the *Skelton* claims because they are related to the claims on which plaintiffs ultimately prevailed. However, the court finds that, since the pursuit of these claims did not fully contribute to the creation of the settlement fund, these hours should be reduced by 33%. The court's review of Boyle's petition reveals that he expended approximately 475 hours pursuing the *Skelton* claims in the district court, the appeal and the petition for certiorari. The court will permit compensation for 67% of those hours, or 318.25.[20]

Second, GM accuses Boyle of excessive "read and review" time. Although every class action staffed by several groups of plaintiffs' lawyers generates some necessary "read and review" time, it is this court's role to ensure that the attorneys do not engage in excessive reviews of each others' work. *See In re Fine Paper Antitrust Litigation*, 751 F.2d 562 (3rd Cir. 1984); *Lackey v. Bowling*, 476 F.Supp. 1111, 1118 (N.D.Ill.1979); *Manual for Complex Litigation*, § 24.22 at 189. The court has reviewed all of Boyle's entries, and finds that, given his role in this litigation, his review time is, for the most part, sufficiently well-documented and within reason.

■ GM's third objection is closely related to the second one. GM accuses Boyle of engaging in too much "conference" time with the other plaintiffs' attorneys. Boyle's fee petition contains references to a number of conferences, phone calls and meetings with the other members of class counsel. The court finds that Boyle's con-

---

19. Calculating fees at historical rates plus a prime rate enhancement, Boyle's petition totals $742,667.86. If calculated at current rates, his total requested fees are less than half that figure. Similarly, calculating Sachnoff's hours at a historical rate with a prime rate enhancer produces fees much greater than the figure obtained by calculating fees in accordance with the firm's current rates.

In a supplemental submission, Boyle encourages this court to follow the decision of Judge Roszkowski in *Airline Stewards and Stewardesses Assn., et al. v. Trans World Airlines, Inc., et al.,* — F.Supp. —— 70 C 2071 (74 C 2063)

(N.D.Ill. September 17, 1986). The court's review of this case reveals that this decision does not support the prime rate interest enhancer requested by Boyle and Sachnoff. In *Airline Stewards,* Judge Roszkowski actually rejected an interest rate enhancement determined according to the prime rate. He found that the attorneys were entitled to an interest enhancement of 7½ percent, the interest rate on a long-term treasury rate purchased at the start of the litigation. *Id.* at 4.

20. The court has disallowed the costs of printing the briefs on appeal.

ference time, like his "review" time, is not greatly excessive in light of the history and demands posed by this litigation (*i.e.*, consolidation of two separate actions, transfer to several judges, and the protracted settlement negotiations). However, the court finds that the timesheets do reflect some duplication of effort and extensive reviewing and conferring with limited benefit to the class. Therefore, the court has reduced the requested hours by 10% to reflect this.

■ Finally, GM asserts that Boyle charged premium rates for tasks which could be performed by paralegals. For the most part, these tasks included review of the case file and communication with class members. Generally, a senior attorney is not entitled to premium rates for services which could be performed by a paralegal or less experienced attorney. *See Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 767 n. 16 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Daggett v. Kimmelman,* 617 F.Supp. 1269, 1282 (D.N.J.1985). After reviewing Boyle's petition, the court finds that some of the hours claimed for senior attorney time should have been delegated to paralegals. The court has reduced Boyle's time accordingly. *See Daggett,* 617 F.Supp. at 1282 ("it was the fee applicant's prerogative to staff every task involved in this case with partners, but that does not automatically entitle the law firm to recover 'partner rates' for everything").

■ The court notes that Boyle also seeks to charge fees for the time spend talking to the press.[21] In the court's view, this time should be compensated at 33% of the hourly rate because it involves minimum benefit to the class and does not involve a task which justifies full compensation for senior attorney time. *Cf. Society for Goodwill to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998–99 (E.D.N.Y.

1983) (disallowing all time spent with media).

■ GM also objects to Boyle's list of expenses, which GM characterizes as overhead charges subsumed in Boyle's hourly rate. *See Ramos v. Lamm,* 713 F.2d 546, 557, 559 (10th Cir.1983); *Roe v. City of Chicago,* 586 F.Supp. 513, 516 (N.D.Ill. 1984). If a case involves unusual expenditures over and above the expenses necessary for the operation of a law firm, then these expenses are properly chargeable to the fund. *Ramos,* 713 F.2d at 559; *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1322 (E.D.N.Y. 1985). The criticized charges in Boyle's petition include automated answering machine services, storage space and office supplies. Given the magnitude of the litigation and the necessity of establishing adequate facilities and support systems to respond to class inquiries and store class information, these expenses cannot be characterized as mere overhead expenses which should be included in Boyle's hourly rate.[22]

### Corinblit & Seltzer

■ The two principals of this firm seek compensation for a total of 100 hours that the firm expended on this litigation. Jack Corinblit logged 41 hours at a claimed rate of $250/hr., and Marc Seltzer logged 59 hours at a claimed rate of $225/hr. These attorneys never appeared before the court on the case. From the timesheets, it appears that their primary involvement in this case was their participation in a deposition in December of 1980.[23]

GM argues that the requested fees should be reduced because nearly all of their time was spent "conferring and reviewing" the work of other attorneys. After analyzing these timesheets, the court concludes that their conference and review time is excessive, and has been reduced accordingly. Corinblit's timesheets reveal

---

21. By the court's calculation, this amounts to approximately 6 hours, 2 of which will be allowed.

22. However, the court has disallowed a public relations expense of $693.75.

23. The court has calculated Corinblit's fees at a rate of $200/hr. and Seltzer's fees at a rate of $175/hr.

that over 23 of his 41 requested hours were spent in conferences with other class counsel. Over 16.5 hours of this conference time included Marc Seltzer, his partner. Seltzer logged 34 hours of conference time, and 13.25 hours of these conferences included Corinblit. The firm has not provided the court with any justification for its double-staffing at these conferences. In *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1325 (D.N.J. 1985), the court disallowed all time spent in conferences between partners and associates of the same firm. Although a wholesale elimination of conference time between members of the Corinblit firm is not warranted under the facts of this case, the court finds that a reduction in these hours is appropriate. In order to offset what might otherwise constitute doublebilling, the court has reduced Corinblit's request by 8.25 hours and Seltzer's request by 6.5 hours. In addition, because the court finds that there has been little benefit resulting from excessive reviewing and conferring with other counsel, the court has reduced the requested hours by 20%.

### Abraham N. Goldman & Associates, Ltd.

GM objects to Goldman's request for compensation in connection with the losing *Skelton* appeal. In accordance with the procedure employed in the Boyle petition, this court has determined Goldman is entitled to fees for 66% of the time expended on the *Skelton* appeal, and his time spent travelling to Washington, D.C. has been reduced 50%.[24]

■ GM also asserts that Goldman's hourly rates are excessive in light of his experience. Mr. Goldman started practicing shortly before these cases were commenced. The court has taken his experi-

ence into account when setting the appropriate hourly rate.[25]

■ Finally, GM objects to Goldman's request for premium compensation for so-called "clerical tasks." The statutory prerequisites of Magnuson-Moss class actions necessitated many communications with class members. Goldman's responsibilities in this litigation involved substantial communication and interaction with individual members of the plaintiff class. His staff included several paralegals who were given significant responsibilities in organizing and maintaining the records of the plaintiff class members. His ability to delegate is reflected in the fact that he claims approximately 2,000 attorney hours and over 5,500 paralegal/data entry hours. *See Phemister v. Harcourt-Brace Jovanovich, Inc.,* 1984–2 Trade Cases ¶ 66,234 at 66,996 (N.D.Ill.1984). However, the nature of Mr. Goldman's involvement in this case was primarily administrative. The court has reduced his time by 10% to reflect the fact that the tasks he undertook toward the end of the litigation were primarily administrative in nature, as well as to adjust for the extensive time spent on conferences, reading and reviewing, with limited benefit to the substantive legal issues in the case.

### Goodkind, Weschler, Labaton & Rudoff

The Goodkind, Weschler firm filed the *Morgan* and *Attard* actions in New York, which were transferred to this court in conjunction with the settlement. These actions were informally stayed in 1983 pending this court's ruling on the class certification motions. Before this stay, these attorneys successfully defeated GM's motion to dismiss, and commenced discovery in these actions. The firm seeks a total of $378,-207.07 in fees for over 1600 hours of work.[26] GM's major objection to this

---

**24.** The court has reduced his requested hours by four hours to reflect time spent travelling.

**25.** The court has calculated Mr. Goldman's fees at a rate of $150/hr.

**26.** The court has calculated the firm's fees at the following hourly rates:

| Attorney | Rate/Hr. |
| --- | --- |
| S. Weschler | $220 |
| E. Labaton | $220 |
| W. Kass | $200 |
| R. Schacter | $160 |
| L. Sucharow | $150 |
| J. Plasse | $120 |
| M. Isaacs | $ 70 |
| E. Perry | $ 70 |

firm's fee petition is that it is too vague to permit any meaningful review.

The firm's timesheets are on a computer printout, and are admittedly brief. The firm has supplemented its petition in its reply brief, however, and the entries are not so cursory that they preclude this court from determining their accuracy. *See Berberena v. Coler,* 753 F.2d 629, 634 (7th Cir.1985) (entries are sufficient if they identify the substance of the work performed). The firm delegated a great deal of the responsibility for the prosecution of the actions to lower-level associates and paralegals. However, there was an extensive amount of time spent on conferences, reading and review with some duplication. Therefore, the court has reduced the requested legal hours by 10% and paralegal time by 5%.

In accordance with the court's guidelines for travel time set forth above, the court has reduced the time claimed for work while travelling to and from Chicago by 50%.[27]

### Francis E. Goodman, P.C.

█ Goodman's fee petition seeks compensation for 451.70 hours of time at a rate of $150/hr. GM asserts that this petition should be substantially reduced or denied in its entirety because Goodman contributed very little in the case, and he spent most of his time reviewing the work of other attorneys. Goodman's petition is replete with entries seeking compensation for his review time. Although this court was not able to observe Mr. Goodman's role in the early stages of the litigation, he has not been a primary player since these cases were transferred to this court in 1982. Given his limited role since that time, the court finds that he is not entitled to compensation for all of his time spent in conferring and reviewing the work of the other attorneys more heavily involved in the litigation. The court disagrees with GM's argument that all this review time must be disallowed, however. The court has deter-

mined that a 25% reduction in the hours claimed is appropriate to reflect the limited benefit from Goodman's hours expended in this litigation. *See In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 579 (3d Cir.1984); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1325 (D.N.J.1985); *United States v. Allen,* 578 F.Supp. 468, 483 (W.D.Wisc.1982).

GM also requests a reduction in Goodman's hours to reflect time spent on the losing *Skelton* claims. Consistent with the procedure adopted for these claims in the Boyle and Goldman petitions, the court has determined that Goodman's time spent on these claims should be reduced by 33%.

### William J. Harte, Ltd.

█ Harte requests attorneys' fees and costs totalling $438,456.94. GM argues that his request should be diminished to reflect the time spent on the losing *Skelton* appeal. The court finds that, for the reasons set forth on pages 10–13, *supra,* a complete elimination of this time is unwarranted.[28] Although the court will allow compensation for time spent on these claims, the attorney and paralegal time will be reduced 33% to reflect its contribution to the ultimate settlement of this action.

GM also accuses Harte of poor record-keeping and vague entries. Although several entries are somewhat cursory, this court is sufficiently familiar with Harte's important role in the litigation to permit these entries without a request for clarification. *Berberena v. Coler,* 753 F.2d 629, 634 (7th Cir.1985). However, because of the extensive amount of time spent on conferences, reading, and review with limited benefit to substantive legal presentation, the court has reduced the requested hours of Mr. Harte by 10% and for similar reasons the paralegal time by 5%.

### Law Offices of Beverly C. Moore, Jr.

█ Moore's petition requests compensation for nearly 4,000 hours of attorney time and over 1,400 hours of paralegal

---

In determining these hourly rates, the court considered the fact that most of these hours were expended between 1980 and 1983.

**27.** The court has disallowed ten hours of travel time.

**28.** The court has reduced costs associated with the *Skelton* appeal and petition for certiorari.

time. GM raises several objections to Moore's request for fees and expenses. First, GM disputes Moore's requested hourly rate of $175/hour, and argues that Moore has insufficient experience to justify such a high fee. Taking into account all the relevant factors previously referred to, the court finds that Moore is entitled to compensation at a rate of $140/hr. Although Moore provided research for the class certification briefs, and demonstrated some expertise in addressing problems posed by this class action, his rate should reflect, among other things, the fact that he does not have a great deal of litigation experience.

█ Second, GM challenges Moore's request for fees in connection with the *Fritz* action. Moore filed this action in the federal district court for the District of Columbia in 1984, shortly before this court issued its interim ruling. After the interim ruling, Moore secured an order transferring the case to this court. The court agrees with GM that the filing of this case did nothing to advance the progress of this litigation or achieve the ultimate settlement of the case. In *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296, 1307 (E.D.N.Y.1985), the court noted:

> One instance of duplicative work arising from the nature of a class action, ... concerns the filing of individual lawsuits by class members. Attorneys who file individual suits on the same claims involved in the class action do not substantially aid the prosecution of the class action. These collateral cases ultimately are dismissed as duplicative. An award of fees for such 'me too' litigation would encourage fruitless and unnecessary work.

Moore's filing of the *Fritz* action in Washington, D.C. is a perfect example of "me too" filing of duplicative litigation criticized in *Agent Orange*. It is significant that none of the other class counsel joined Moore in the filing of this action, nor do they seek any fees in connection with it. The court finds that Moore is not entitled to any fees or expenses in connection with the *Fritz* case because this action involved unnecessary expenditures of time and money which bear no relation to the favorable settlement in this case or the creation of the settlement fund.[29]

█ Moore did not join the other plaintiffs' counsel in the settlement agreement. In fact, he strongly resisted the settlement which created the common fund. GM argues that Moore should not be compensated for the time spent resisting the settlement, because these efforts hindered the settlement negotiations instead of helping them. The court agrees with GM that Moore is not entitled to full compensation for the time spent objecting to the settlement. The fund does not have to pay attorneys' fees for the time spent *objecting* to its creation. Although Moore's time spent on the settlement is not fully compensable, the court finds that he is entitled to some remuneration for his participation in the settlement processes. An objector to a settlement process often sharpens the issues and may achieve additional benefits for the class. Although he opposed the settlement, Moore's participation in the settlement negotiations cannot be dismissed in its entirety. Therefore, the court has determined that he is entitled to 50% of his time in the settlement stage of the case.

Moore took one trip to Reading, Pennsylvania and approximately seventeen trips to Chicago. Consistent with the guidelines set forth *supra* on page 1381, the court has reduced his work travel time by 50%.[30] The court has also reduced Moore's time spent talking with the media to 33%. *See Society for Goodwill to Retarded Children*, 574 F.Supp. 994, 998–99 (E.D.N.Y. 1983).[31] Because of the very extensive

---

**29.** By the court's calculation, Moore spent 155.8 hours of attorney time and 73.3 hours of paralegal time on the Fritz action.

**30.** Moore seeks compensation for 17 trips to Chicago.

**31.** The court rejects Moore's request for compensation for the following entries unrelated to the present class action:

amount of time spent on conferences, reading and review, and especially preliminary matters long before litigation commenced, with the very limited benefit to the success of the case, the court has reduced the requested hours of Mr. Moore by 40% and paralegal time by 11%.

 Moore requests expenses totalling $43,206.98. GM argues that some of these expenses are not compensable because they should be considered part of overhead. *See In re Fine Paper Antitrust Litigation, supra.* In particular, GM argues that the charges for overtime word processing should have been subsumed in Moore's hourly rate. The court disagrees. Given Moore's role in the briefwriting process, the resort to overtime staff to complete the pleadings in this case was sufficiently necessary and predictable. The court does not view these charges as unreasonable.[32]

### Sachnoff, Weaver & Rubenstein, Ltd.[33]

GM's major objection to Sachnoff's entries revolves around the firm's request for computation of fees at historic rates with an upward adjustment to reflect interest calculated at the prime rate. The court's has decided that it is in the interests of

| 2/19/85 | T/C w/Ben Todd re Pope v. GM | 4.7 |
| 12/03/82 | Prepare Findex of Briefs | 11.0 |
| 10/25/79 | T/C w/W.Va. attys in Ford Piston scuffing case | 1.0 |
| 8/12/79 | Watched Report on NBC program Prime Time Sunday | .3 |
| | | 17.0 |

**32.** However, most of Moore's miscellaneous expenses have been eliminated because they bear no apparent relationship to this action (ex: bank service charges, post cards, tape recorder, magazine).

**33.** The Sachnoff firm is the only firm that requests reimbursement for its time spent preparing a fee petition. Some of this time was spent preparing the firm's own petition and some was expended preparing the joint briefs filed by the class counsel in this case. In general, the courts have agreed that this time is not compensable in common fund cases because it is clearly not time spent creating, preserving or enlarging the fund. *In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 579 (3d Cir.1984); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102 (2d Cir. 1977); *Lindy Brothers, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 111 (3d Cir.1976); *Bailey v. Heckler,* 621 F.Supp.

justice to award all fees on a current basis, regardless of when the work was performed.[34]

GM also accuses the Sachnoff firm of overbilling and vague time keeping. The overbilling charge stems from GM's assertion that the hours spent on "abandoned claims" and the time spent briefing the class certification motions must be reduced to reflect the limited nature of the relief obtained. These objections have been addressed in earlier portions of the opinion. Suffice it to say that this firm has been at the forefront of this litigation and has played a major role in achieving the creation of the settlement fund. The Sachnoff firm has fulfilled a lead role and has submitted high quality work throughout this litigation. Because of the extensive amount of time spent on conferences (including intra-firm conferences), reading and review, with a limited benefit for same, the court has reduced the requested hours by 5% and paralegal time by 5%.[35]

### Zwerling, Schacter & Zwerling

Zwerling, Schacter is a New York-based firm which was formed in January of 1985, after its partners left the Goodkind, Wes-

521, 524 (W.D.Pa.1985); *Hew Corp. v. Tandy Corp.,* 480 F.Supp. 758, 764 n. 10 (D.Mass.1979); *Population Services International v. Carey,* 476 F.Supp. 4, 7 n. 3 (S.D.N.Y.1979); *Spiekerman v. Whittaker Corp.,* 598 F.Supp. 1, 8 (E.D.N.Y. 1978). The court will follow this rule and disallow the time spent preparing the fee petition for the Sachnoff firm. However, the court will allow $15,000 for the time spent drafting the joint brief.

**34.** The court has awarded the Sachnoff firm fees at the following rates:

| Attorney | Rate/Hr. |
| --- | --- |
| L. Sachnoff | $240 |
| B. Rosen | $145 |
| M. Tennenbaum | $125 |
| M. Denlow | $110 |
| C. Watkins | $135 |
| J. Schumacher | $130 |
| J. Feldman | $ 80 |
| D. Morris | $ 70 |
| M. Kaufman | $ 90 |

**35.** The court has reduced the award by 17 hours (10 for BAR, 7 for JAS) for travel time and 5 hours spent speaking to Mr. Moore about the *Fritz* action.

chler firm. The firm has acted as co-counsel with Goodkind in the *Morgan* and *Attard* actions from January of 1985 to the present. It requests compensation for 90.-30 hours of attorney and paralegal time. The court has reviewed the firm's timesheets, and has reduced travel time by 50% for the reasons previously indicated.[36] Because of the very extensive time spent on conferences and review, again the court has reduced the requested hours by 20%.

### Request for a Multiplier

Having calculated the proper lodestar amount for plaintiffs' attorneys, the court now turns to plaintiffs' request for an upward adjustment of .75 to be added to the lodestar. The class counsel argues that this multiplier of 1.75 is necessary to compensate them for the contingent nature of the lawsuit and the significant risks undertaken by them in this case. General Motors disputes the propriety of a multiplier on two grounds. First, it asserts that multipliers are never available under the statutory fee provision in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(2). Second, it maintains that, even if a multiplier were available, the facts of this case do not warrant any upward adjustment of the basic lodestar amount.

▮ These actions were commenced and prosecuted under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* A significant portion of the class counsels' time was expended investigating the individual claims to ensure that the Act's 100-plaintiff requirement [*See* 15 U.S.C. § 2310(d)(3)(C)] was fulfilled (*See* Joint Memorandum in Support of Class Counsels' Fee Petitions at 6, 12 n. 1, 14 n. 2). Plaintiffs sought, and ultimately obtained, class certification under the Magnuson-Moss Act. *See* Interim Order, *Skelton v. General Motors Corp.*, No. 79 C 1243 (N.D.Ill. December 20, 1984). Under these circumstances, even if the fee award is based on the common fund doctrine, any limitation contained in the Magnuson-Moss Warranty Act is a relevant consideration in determining whether to award a "risk" multiplier in this case. The structure of the settlement agreement should not divert the court from the Congressional intent underlying the passage of this Act.

Magnuson-Moss permits a court to award a successful plaintiff

> a sum equal to the aggregate amount of costs and expenses (including attorneys' fees *based on actual time expended*) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action....

15 U.S.C. § 2310(d)(2) (emphasis supplied). GM argues that the language underscored above precludes this court from awarding a multiplier in a Magnuson-Moss case. Unlike most fee-shifting statutes, which permit awards of "reasonable" attorneys' fees, this Act appears to place a ceiling on the fees that a court may award a successful plaintiff. The plain language of the statute would seem to preclude any upward multiplier adjustment of the attorneys' fees awarded to a successful plaintiff. In *Ventura v. Ford Motor Co.*, 173 N.J.Super. 501, 414 A.2d 611, 612 (1980), *aff'd*, 180 N.J.Super. 45, 433 A.2d 801 (1981), the court denied a request for a multiplier of four, concluding that, "[a]n attorneys' fee allowance under the Magnuson-Moss Warranty Act is limited to 'actual time expended' but may exceed actual billings to a prevailing party if 'reasonably incurred.'" The court agrees with GM and the *Ventura* court that Section 2310(d)(2) evinces a Congressional intent to limit the fee award to the time actually expended in pursuit of a plaintiff's claim. Accordingly, the court concludes that a plaintiff in a Magnuson-Moss case is not entitled to an upward multiplier adjustment of the fees awarded.

▮ However, even if § 2310(d)(2) does not prohibit a fee award which includes a multiplier, the court finds that the background of this litigation does not justify an increase in the lodestar figures set forth in this opinion. This lawsuit was settled at a

---

**36.** The court reduced Mr. Schachter's hours by 4 to reflect time spent travelling to and from Chicago.

relatively early stage of the litigation. In view of the fee rates and hours allowed, this case does not present the exceptional circumstances, the exceptional kind of risk, or the exceptional success that warrants the use of a multiplier.

In the past, courts in both common fund and statutory fee cases have permitted upward adjustments of the lodestar figure to compensate plaintiffs' counsel for the delay in payment, the contingent nature of the lawsuit, superior representation, the risk of litigation and the exceptional quality of the results obtained. *See, e.g., International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1273–74 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598, 604 (7th Cir.1979), *cert. denied,* 454 U.S. 1060, 102 S.Ct. 612, 70 L.Ed.2d 599 (1981); *Northcross v. Board of Education,* 611 F.2d 624, 638 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir. 1974); *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir.1973); *Phemister v. Harcourt-Brace Jovanovich, Inc.,* 1984–2 Trade Cases ¶ 66,234 at 66,997 (N.D.Ill.1984). In *Hensley,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), the Supreme Court implicitly affirmed this practice, holding that

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.

*Hensley,* 46 U.S. 424, 435, 103 S.Ct. 1933, 1940.

In the past few years, however, the Supreme Court and the appellate courts of this circuit have begun to question the propriety of awarding a multiplier to the basic lodestar figure. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum v. Stenson,* 465

U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1986); *In re Burlington Northern, Inc. Employment Practices Litigation,* 803 F.2d 279 (7th Cir.1986); *Kirchoff v. Flynn,* 786 F.2d 320 (7th Cir.1986); *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir. 1984); *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir.1981). In *Blum v. Stenson,* the plaintiffs filed a § 1983 class action against the New York State Department of Social Services, challenging the state's method of allocating Medicare Benefits. The case was decided on cross motions for summary judgment after only one set of plaintiffs' interrogatories had been served and answered. *See generally Stenson v. Blum,* 476 F.Supp. 1331 (S.D.N.Y.1979). The order granting summary judgment certified the class and entered final judgment for the plaintiffs. The Second Circuit affirmed this ruling, and the plaintiffs' counsel then petitioned the district court for an award of attorneys' fees pursuant to 42 U.S.C. § 1988. The district court determined a lodestar amount, and then awarded plaintiffs' counsel an upward adjustment of 50% to reflect "the quality of representation, the complexity of the issues, and the 'great benefit to the large class' that was achieved." *Blum,* 465 U.S. at 891, 104 S.Ct. at 1545, citing *Stenson v. Blum,* 512 F.Supp. 680, 685 (S.D.N.Y.1981). The Second Circuit affirmed this award, and defendants appealed to the Supreme Court.

The Supreme Court rejected at the outset defendants' argument that a multiplier is never permissible. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548. It indicated, however, that multipliers should not be granted as a matter of course, and are appropriate only in rare cases which produce exceptional results. The court noted that, "[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is *presumed* to be the reasonable fee contemplated by [the statute]". *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (emphasis added).

The Court then analyzed the four reasons that the district court articulated for allowing an enhanced fee award. With re-

spect to the novelty and complexity of the issues, the court held:

> The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates. There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally will be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award.

*Id.* at 898, 104 S.Ct. at 1548–1549. Similarly, the Court also held that the "quality of representation is also reflected in the hourly rate, and may justify an upward adjustment "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.' " *Blum,* 465 U.S. at 899, 104 S.Ct. at 1549. The Court also held that, since the "results obtained" are generally factored into the determination of the lodestar, "it normally should not provide an independent basis for increasing the fee award." *Id.* (footnote omitted). Finally, because plaintiffs had not alleged an enhancement for the risk incurred in litigating this action, the Court held that a multiplier for "risk" was inappropriate. It expressly declined to decide whether risk of not prevailing could ever justify an enhancement of the fee award. *Id.* at 900 and n. 16, 104 S.Ct. at 1550 and n. 16.

In *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* — U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Court reiterated *Blum*'s restrictive approach to multipliers in statutory fee cases. The *Delaware Valley* plaintiffs were awarded a multiplier to reflect the "superi-

or" quality of representation and the contingent nature of the case. Following the position set forth in *Blum,* the Court held that the award of a multiplier for superior representation was clearly inappropriate. It noted:

> A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, ... the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.... In short, the lodestar figure includes most, if not all, of the relevant factors comprising a 'reasonable' attorneys' fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

106 S.Ct. at 3098, 3099. The Court reserved ruling on the issue of whether a multiplier can be justified by the risk of loss, and set the matter for reargument next term. *Id.* at 3100.

In the present case, the only grounds on which plaintiffs request a multiplier is the alleged risk of loss. In *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392 (7th Cir. 1984), the court noted that, "[i]n this circuit, the risk of losing 'alone does not justify the use of a multiplier,' " *citing Bonner v. Coughlin,* 657 F.2d 931, 936 (7th Cir. 1981). The *McKinnon* court explained its reservations in connection with a "risk bonus":

> The fundamental problem of a risk bonus is that it compensates attorney, indirectly but effectively, for bringing unsuccessful civil rights suits, even though the attorney's fee statute is expressly limited to cases where the party seeking the fee prevails.... Suppose a plaintiff asks for and receives a multiplier of 2 because he had a 50 percent chance of losing the

case. This means that if the plaintiff's lawyer tries 10 such cases and wins 5 (as one would expect, if the risk of loss is indeed 50 percent), he will be paid as if he had won them all; that is, he will be paid twice his normal charge for each of the 5 cases he won, to compensate him for getting nothing for the cases he lost. Indeed, if the logic of the risk multiplier were applied consistently, the attorney's fee would be larger the riskier the case, even though this would mean rewarding lawyers for flooding the courts with unmeritorious litigation, something we very much do not need. Imagine a class of cases where only one in 50 plaintiffs prevails. Then the risk multiplier would be 50, and a lawyer who brought all 50 cases and lost 49 would receive the same compensation that he would have received had he been certain to win all 50 cases (in which event there would have been no multiplier), rather than (virtually) certain to lose 98 percent of them. *McKinnon*, 750 F.2d at 1392. This concern was recently reiterated in *Kirchoff v. Flynn*, 786 F.2d 320, 326 (7th Cir.1986) ("One common concern with compensation for risk is that the multiplier should rise as the probability of success falls, soaking the unlucky defendant who had a good case (more than a 50% chance of prevailing but lost anyway and therefore faced a huge multiplier"), and *In re Burlington Northern, Inc. Employment Practices Litigation*, 803 F.2d 279, 286 (7th Cir.1986) (Seventh Circuit has not favored the use of risk multipliers). *See generally* Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981) (listing several other problems associated with upward adjustments to compensate for the risk of not prevailing); Comment, *Nonpayment Risk Multipliers: Incentives or Windfalls?*, 53 U.Chi.L.Rev. 1074 (1986).

This case has been pending before this court since 1982. In the course of these proceedings, the court has had the opportunity to observe the class counsels' vigorous and able representation of the plaintiffs in this case, and has frequently commented on the superior quality of representation on both sides of this case. This litigation un-doubtedly involved significant management obstacles, and entailed research into previously uncharted areas of the Magnuson-Moss Warranty Act. Despite the complexities of the case, however, the court finds that a "risk" multiplier is not necessary to fully compensate the class counsel for their representation of plaintiffs in these consolidated cases. Although the litigation has been pending a long time, the action never proceeded very far beyond the initial pleading stages. Some limited discovery was conducted; however, the bulk of the actual discovery on the merits had barely commenced when the parties began discussing the possibility of settlement.

Accordingly, in light of the state in which the parties ultimately settled the case, the court finds that an upward multiplier of the basic lodestar fees is neither necessary nor appropriate. The attorneys' fees that this court has included in its calculation of the lodestar amounts, particularly the allowance derived from current or near current rates for all attorneys, adequately compensates these firms for the "risk" involved in prosecuting this case. *See In re Burlington Northern, Inc. Employment Practices Litigation*, 803 F.2d 279, 286–87 (7th Cir. 1986) (award of fees at current rates ameliorates the risk of nonpayment); *Technology Fund, Inc. v. Kansas City Southern Industries, Inc.*, 72 F.R.D. 433, 440 (N.D. Ill.1976), *In re Penn Central Securities Litigation*, 416 F.Supp. 907, 919 (E.D.Pa. 1976), *rev'd on other grounds*, 560 F.2d 1138 (3d Cir.1977).

### Conclusion

For the reasons set forth above, the court finds that the class counsel are not entitled to an upward adjustment or "risk multiplier" for their pursuit of this litigation. Whether viewed in terms of the Magnuson-Moss Act or the common fund doctrine, the fees calculated in accordance with the principles set forth in this opinion provide the proper amount of compensation to the plaintiffs' attorneys in this case. Accordingly, the court awards the fees and expenses set forth below to the nine law firms who have successfully represented the class in this case:

| Attorney | Allowed Rate | Allowed Hours | Total Fees | Paralegals (P) Expenses (E) | Total |
|---|---|---|---|---|---|
| Charles A. Boyle & Associates | $190/hr. | 1407.57 | $267,438.30 | $ 2,793.00 (P)<br>$ 30,763.42 (E) | $ 300,994.72 |
| Corinblit & Seltzer | | | | | |
| J. Corinblit | $200/hr. | 26.20 | $12,590.00 | -0- (P) | $ 14,321.11 |
| M. Seltzer | $175/hr. | 42.00 | | $ 1,731.11 (E) | |
| Abraham N. Goldman & Assoc., Ltd. | | | | | |
| A. Goldman | $150/hr. | 1776.80 | $269,576.25 | $175,193.24 (P) | $ 464,414.75 |
| Associates | $75/hr. | 40.75 | | $ 19,645.26 (E) | |
| Goodkind, Weschler, Labaton & Rudoff | | | | | |
| S. Weschler | $220/hr. | 18.85 | $144,962.00 | $ 7,278.42 (P) | $ 165,264.74 |
| E. Labaton | $220/hr. | 2.50 | | $ 13,024.32 (E) | |
| W. Kass | $200/hr. | 16.20 | | | |
| R. Schacter | $160/hr. | 157.50 | | | |
| L. Sudarow | $150/hr. | 40.08 | | | |
| J. Plasse | $120/hr. | 655.35 | | | |
| M. Isaacs | $70/hr. | 69.85 | | | |
| E. Perry | $70/hr. | 302.40 | | | |
| Others | $85/hr. | 13.10 | | | |
| Frances E. Goodman, P.C. | $120/hr. | 307.20 | $36,864.00 | -0- (P)<br>$ 2,510.00 (E) | $ 39,374.00 |
| William J. Harte, Ltd. | | | | | |
| W. Harte | $200/hr. | 749.80 | $154,664.75 | $165,685.97 (P) | $ 331,438.72 |
| Associates | $85/hr. | 55.35 | | $ 11,088.00 (E) | |
| Law Offices of Beverly C. Moore, Ltd. | | | | | |
| B. Moore | $140/hr. | 2204.00 | $310,510.00 | $ 43,441.50 (P) | $ 396,813.32 |
| Other Attys. | $50/hr. | 39.00 | | $ 42,861.82 (E) | |
| Sachnoff, Weaver & Rubenstein | | | | | |
| L. Sachnoff | $240/hr. | 663.60 | $725,832.40 | $ 51,239.44 (P) | $ 885,934.97 |
| B. Rosen | $145/hr. | 2199.72 | | $ 93,863.13 (E) | |
| M. Tennenbaum | $125/hr. | 28.30 | | $ 15,000.00 (jt.E) | |
| M. Denlow | $110/hr. | 22.55 | | (brief) | |
| C. Watkins | $135/hr. | 2.60 | | | |
| J. Schumacher | $130/hr. | 1763.50 | | | |
| J. Feldman | $80/hr. | 5.46 | | | |
| D. Morris | $70/hr. | 6.20 | | | |
| M. Kaufman | $90/hr. | 123.50 | | | |
| Zwerling, Schacter & Zwerling | | | | | |
| R. Schacter | $160/hr. | 66.56 | $10,759.60 | $ 54.00 (P) | $ 13,037.70 |
| J. Zwerling | $160/hr. | .6 | | $ 2,224.10 (E) | |
| J. Barkhorn | $70/hr. | .2 | | | |
| TOTALS: | | | $1,933,197.30 | | $2,611,593.90 |

ARLIE GLEN SKELTON, JR., *et al.*, Plaintiffs,

vs.

GENERAL MOTORS CORPORATION, Defendant,

No. 79 C 1243

JOSEPHINE C. NEWTON, *et al.*, Plaintiffs,

vs.

GENERAL MOTORS CORPORATION, Defendant,

No. 80 C 2151

RICHARD J. FRITZ, *et al.*, Plaintiffs,

vs.

GENERAL MOTORS CORPORATION, Defendant,

No. 85 C 4805

ATTARD, *et al.*, Plaintiffs,

vs.

GENERAL MOTORS CORPORATION, Defendant,

No. 86 C 4986

MORGAN, *et al.*, Plaintiffs,

vs.

GENERAL MOTORS CORPORATION, Defendant.

No. 86 C 4987

## ORDER APPROVING SETTLEMENT, FINAL NOTICE, AND ENTERING FINAL ORDER AND JUDGMENT

The Court has considered the Agreement of Settlement dated June 19, 1986 ("Agreement"), including the exhibits annexed thereto. The Notice of Conditional Class Certification and Hearing on Proposed Settlement ("Initial Notice") has been given in accordance with the prior order of this Court to the class (the "Class") consisting of

All original owners (other than solely for purposes of resale) of a General Motors 1976–1980 model year vehicle equipped with a THM 200 transmission purchased in the United States, its possessions and territories, or the District of Columbia, who incurred any transmission repair expense within the first 50,000 miles of use of that vehicle.

On October 30, 1986, the Court held a hearing for the purpose of determining whether the terms of the Agreement are fair, reasonable and adequate and should be approved by the Court in full settlement of the above-captioned actions ("Actions") and for the purpose of passing upon the application of counsel for the Class for costs and expenses (including attorneys' fees). The Court has considered all arguments presented.

It is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. The Court finally approves the terms of the Agreement as fair, reasonable and adequate and directs consummation of all its terms and provisions.

2. Plaintiffs' Counsel are awarded $2,611,593.90 for costs and expenses (including attorneys' fees).

3. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, the Actions are dismissed on the merits with prejudice as to all Class members who did not request exclusion from the Class in the time and manner provided in the Initial Notice, and in favor of General Motors Corporation, without costs to any party. General Motors Corporation having agreed to create the Settlement Fund pursuant to the terms of the Agreement as approved by the Court in paragraph 1 of this Order, General Motors Corporation, its present or former officers, directors, employees, agents, heirs, executors, administrators, successors, reorganized successors, assigns, subsidiaries, affiliates, parents, divisions, and predecessors, shall be, and the same hereby are, released and discharged from any and all claims, causes of action and liability whatsoever alleged or asserted or which could have been alleged or asserted in the Actions arising out of, or in any way relating to THM 200 transmissions (excluding claims for personal injury resulting from physical impact); provided, however, that

this judgment and release, and the provisions of paragraph 4, shall not apply to any owner who incurred his first transmission repair expense after July 8, 1986. Nothing contained in the Agreement or in this Final Order and Judgment shall be deemed an admission or finding of wrongdoing by, or with respect to, any party.

4. All members of the Class who did not duly request exclusion therefrom in the time and manner provided in the Initial Notice are hereby barred, permanently enjoined and restrained from commencing or prosecuting any action, suit, proceeding, claim or cause of action in any jurisdiction or court against General Motors Corporation or any of the other entities or persons who are to be discharged as noted above in paragraph 3, based upon, relating to, or arising out of, any of the matters which are discharged and released pursuant to paragraph 3 hereof.

5. Notice of Court Approval of Settlement and Dismissal and Proof of Claim Forms in the forms attached to this Order and to the Agreement as Exhibits G and H are approved as to form and shall be mailed by first class mail, postage prepaid by General Motors, as soon as reasonably practicable following the effective date of settlement, to all Class members who have not requested exclusion at their addresses as they appear in divisional history files maintained by General Motors.

6. Upon delivery to Plaintiffs' Counsel of a copy of this Final Order and Judgment, such orders of the Court as may be necessary, and written notice from counsel of record for General Motors Corporation that the effective date of settlement, as defined in the Agreement, has occurred, distribution and payment of the Settlement Fund created by General Motors pursuant to the Agreement shall be made in the following manner:

(a) In accordance with paragraph 34 of the Agreement, $2,611,593.90 shall be reserved from the Settlement Fund with respect to Class Counsel's application for allowance of costs and expenses (including attorneys' fees), such amounts to be payable as soon as possible.

(b) Costs reasonably incurred in the administration of the Settlement Fund and not previously reimbursed shall be paid from the Settlement Fund in accordance with paragraph 27 of the Agreement.

(c) In accordance with paragraphs 23, 24 and 26 (if applicable) of the Agreement, the remainder of the Settlement Fund shall be paid to members of the Class identified as entitled to receive distributions in accordance with the procedures and formulas set forth in the Agreement and determining the amount to be distributed to each member.

(d) Any monies remaining in the Settlement Fund, or accrued interest, following the payments described in paragraphs 6(a), (b) and (c), shall revert to General Motors.

7. If the effective date of settlement, as defined in the Agreement, does not occur for any reason whatsoever this Final Order and Judgment shall be deemed vacated and shall have no force and effect whatsoever. There is no just reason for any delay and this Order is immediately appealable.

8. The Court reserves jurisdiction over the consummation and administration of the Settlement Fund in accordance with this Final Order and Judgment.

## EXHIBIT G

### NOTICE OF COURT APPROVAL OF SETTLEMENT AND DISMISSAL

TO: All original owners (other than solely for purposes of resale) of a General Motors 1976–1980 model year vehicle equipped with a THM 200 transmission purchased in the United States, its possessions and territories, or the District of Columbia, who incurred any transmission repair expense within the first 50,000 miles of use of that vehicle.

You were previously advised that a proposed settlement had been entered in the above-captioned actions (the "Actions").

After a hearing on October 30, 1986, the Court entered an order: (i) finally approving the settlement contained in the Agreement of Settlement dated June 19, 1986 ("Agreement"), as fair, reasonable and adequate; (ii) approving the form of this second and final Notice and the attached Proof of Claim Form; (iii) directing the mailing of this Notice and the attached Proof of Claim Form; (iv) dismissing the Actions on the merits with prejudice as to all members of the above class, which has been conditionally certified for settlement purposes only (the "Class"), who have not requested exclusion, releasing and discharging General Motors from any and all claims, causes of action and liability whatsoever asserted or which could have been asserted in the Actions arising out of, or in any way relating to, THM 200 transmissions (excluding claims for personal injury resulting from physical impact); provided that owners who incurred their first repair expense after July 8, 1986 are not subject to this dismissal with prejudice and release; (v) awarding costs and expenses (including attorneys' fees) to counsel for the Class in the amount of $2,611,593.90; and (vi) barring, permanently enjoining and restraining members of the Class who have not requested exclusion from commencing or prosecuting any action, suit, proceeding, claim or cause of action in any jurisdiction or court against General Motors Corporation based upon, relating to, or arising out of, any of the matters which are discharged and released pursuant to item (iv) above.

EACH CLASS MEMBER MUST SIGN AND COMPLETE THE ATTACHED PROOF OF CLAIM TO REQUEST A DISTRIBUTION FROM THE SETTLEMENT FUND. IF YOU ARE NOT A CLASS MEMBER OR IF YOU HAVE FILED A REQUEST FOR EXCLUSION FROM THE CLASS, YOU SHOULD NOT COMPLETE THE ATTACHED PROOF OF CLAIM AND SHOULD DISREGARD THIS NOTICE.

To request participation in the settlement you must complete and execute the attached Proof of Claim and mail same, by first-class mail, postage prepaid, postmarked on or before ―――――, 1986 addressed to the Administrator, P.O. Box 65, Excelsior, MN 55331.

A Proof of Claim shall be deemed to have been submitted when posted, if a postmark is indicated on the envelope and it was mailed, by first-class mail, postage prepaid and addressed in accordance with the instructions given in said Proof of Claim. Proofs of Claim submitted otherwise shall be deemed to be submitted at the time they are actually received by the Administrator of the settlement. The Settlement Fund will be distributed after all Proof of Claim forms timely filed have been processed. Processing of Proof of Claim forms may take a considerable period of time.

The settlement provides that General Motors shall deposit into an escrow account the aggregate amount of Seventeen Million Dollars ($17,000,000) (plus eight percent (8%) interest compounded quarterly during the period beginning thirty (30) days after execution of the Agreement and ending on the date of the deposit in the escrow account), in full settlement of all claims of the Class members concerning the THM 200 transmission in their vehicles. The funds deposited into escrow are designated the "Settlement Fund."

The Agreement defines "Qualified Repair Expenses" as (1) actual parts and labor expenses necessarily incurred to repair a THM 200 transmission; (2) incurred within the first 50,000 miles of vehicle use, and (3) incurred prior to July 8, 1986. "Eligible Qualified Repair Expenses" are calculated according to the following table:

| Occurrence of Qualified Repair Expenses | Amount of Qualified Repair Expense Eligible for Pro Rata Distribution |
|---|---|
| Prior to and including 24,000 miles of use | 90% |
| Between 24,000 and including 36,000 miles of use | 80% |
| Between 36,001 and including 50,000 miles of use | 60% |

Only transmission repair expenses incurred within the first 50,000 miles of vehicle use are eligible for reimbursement; however in the case of multiple transmission repair expenses incurred as to a particular vehicle within the first 50,000 miles of vehicle use, the applicable percent-

age for determining the Eligible Qualified Repair Expenses will be set by the mileage at the time of the first repair.

In summary, the Settlement Fund will be allocated to reimburse, on a pro rata basis, the Eligible Qualified Repair Expenses of Class members who submit completed Proof of Claim Forms and supporting documentation eligible for possible reimbursement pursuant to this Agreement. A portion of the Fund will be allocated among Class members who have incurred repair expenses that already were reimbursed by General Motors.

The Settlement Fund, following the reserve from it of $_____ in plaintiff's counsel's costs and expenses (including attorneys' fees) incurred in the Actions and administrative fees and costs as determined by the Court, shall be distributed as follows:

(a) Up to Three Hundred Thousand Dollars ($300,000) in the aggregate shall be divided equally among Class members who file a completed Proof of Claim Forms and supporting documentation and have incurred Eligible Qualified Repair Expenses, but prior to the date of the Agreement have received reimbursement from General Motors for that Eligible Qualified Repair Expense. No distribution under this subparagraph shall exceed $75 for each eligible vehicle with an Eligible Qualified Repair Expense.

(b) Following the calculation of amounts required for the distributions required by paragraph (a), the remainder of the Settlement Fund shall be distributed to each Class member with an Eligible Qualified Repair Expense, not previously reimbursed from General Motors, who submits a completed Proof of Claim Form and supporting documentation. Such distribution shall be pro rata based on the percentage which the amount of each such Class member's Eligible Qualified Repair Expense claim bears to the total amount of all such claims filed by all such members. In the case of multiple Qualified Repair Expenses incurred as to a particular vehicle within the first 50,000 miles, in which one or more of the Qualified Repair Expenses is unreim-

bursed, any such unreimbursed Qualified Repair Expenses are eligible for reimbursement pursuant to this paragraph (b). In no event shall a Class member receive more than the actual amount of such Eligible Qualified Repair Expenses actually incurred.

(c) Any portion of the Settlement Fund or accrued interest remaining after the distributions pursuant to paragraphs (a) and (b) shall revert to General Motors.

(d) If the number and amount of claims are such that pro rata distributions pursuant to paragraph (b) will fall below (i) 75% of a claimant's Eligible Qualified Repair Expenses, or (ii) 50% of a claimant's the Qualified Repair Expenses, whichever is greater, General Motors will deposit sufficient additional funds to provide pro rata distributions at (i) the 75% level of Eligible Qualified Repair Expenses, or (ii) the 50% level of Qualified Repair Expenses, whichever is greater; provided, however, General Motors is not obligated to make any deposit beyond a maximum additional deposit of Two Million Five Hundred Thousand Dollars ($2,500,000). In the event that the maximum additional payment of $2.5 million is paid pursuant to this paragraph, that amount shall be distributed pro rata to all claimants pursuant to paragraph (b) above. In no event shall a class member receive more than the actual amount of such Eligible Qualified Repair Expenses actually incurred.

For purposes of distributions under paragraphs (a) and (b), each Class member who owns more than one vehicle meeting the class definition shall be permitted to file a proof of claim form for each such vehicle.

IF YOU DO NOT FILL OUT, SIGN AND MAIL THE ATTACHED PROOF OF CLAIM FORM YOU WILL NOT SHARE IN THE SETTLEMENT FUND.

Any inquiries you may have should be directed in writing to the Administrator, c/o P.O. Box 65, Excelsior, MN 55331. Please include your name, address and Vehicle Identification Number ("VIN").

**1398**

Clerk of the Court,
United States District Court for
the Northern District of Illinois

Dated: _____, 1986

EXHIBIT H

PROOF OF CLAIM FORM

Pursuant to the Order of the Court entered on _____, 1986, this Proof of Claim Form is being sent to you as an original owner of a 1976 through 1980 model General Motors passenger car originally equipped with a THM 200 transmission purchased in the United States, its possession or territories, or the District of Columbia. If you are such an owner, you may be entitled to reimbursement from a settlement fund created by General Motors if you incurred a transmission repair expense within the first 50,000 miles of vehicle use.

To receive a distribution from the Settlement Fund, you must complete a separate Claim Form for each such vehicle you purchased, and you must provide the following information and sign this Claim Form.

1. Your name _____
2. Your address _____
Street Number and Street Name

_____
City, State and Zip Code

3. Your daytime telephone number (_____) _____
Area Code Number

Your evening telephone number (_____) _____
Area Code Number

4. Your Social Security Number or Tax Identification Number

_____

5. Please provide the following information for the vehicle for which you are making a claim:
 a. Model year of vehicle _____
 (1976, 1977, 1978, 1979 or 1980)

 Make of vehicle _____
 c. Vehicle Identification Number (13–digits—can be found on title or registration or on the lower driver's side portion of the dashboard opposite the windshield.)

 _____

 d. Date of purchase of the vehicle _____
 e. Name in which vehicle was registered _____
6. State the total unreimbursed repair bills for actual parts and labor expenses necessarily incurred relating only to the transmission in your vehicle which were performed prior to July 8, 1986, and were within the first 50,000 miles of use of the vehicle. $_____.

You must list on the attached schedule the information required for all eligible unreimbursed repair expenses. Do not list repairs for which you have previously been reimbursed.

You must attach paid receipts or other evidence for all unreimbursed repair expenses for the transmission in your vehicle.

IMPORTANT: FAILURE TO ATTACH THESE DOCUMENTS OR TO LIST ALL INFORMATION REQUESTED IN THE SCHEDULE WILL PREVENT YOU FROM RECEIVING A PRO RATA DISTRIBUTION FOR QUALIFIED REPAIR EXPENSES FROM THE SETTLEMENT FUND. YOU ARE ENTITLED TO RECEIVE A PORTION OF THE SETTLEMENT FUND EVEN IF YOUR QUALIFIED REPAIR EXPENSES HAVE BEEN PREVIOUSLY REIMBURSED. HOWEVER, YOU MAY RECEIVE A LARGER PORTION OF

THE SETTLEMENT FUND IF YOU HAVE UNREIMBURSED QUALIFIED REPAIR EXPENSES. IT IS, THEREFORE, IMPORTANT THAT YOU ATTACH QUALIFIED TRANSMISSION REPAIR BILLS TO THIS PROOF OF CLAIM FORM.

7. This section is to be completed only if the owner incurred transmission repair expenses that already were reimbursed by General Motors. State the total repair bills for actual parts and labor expenses necessarily incurred relating only to the transmission in your vehicle which were performed prior to July 8, 1986, and were within the first 50,000 miles of use of that vehicle which were previously reimbursed in whole or in part. $_____ .

8. This section is to be completed only if the owner of the vehicle (listed in No. 5(e) above) is different from the person making the claim as listed in No. 1 above.

 a. If the answer to No. 5(e) is a corporation, please state your position in that corporation.

 b. If the answer to No. 5(e) is a partnership, please state whether you are a general partner or have authority to complete and execute this claim:

 I am a General Partner: Yes ___ No ___

 If no, my position or title is:

 _____,

 and I have been authorized to complete and execute their Proof of Claim.

 c. If the answer to No. 5(e) is a person now deceased, please state the capacity in which you are completing this Proof of Claim.

 Executor _____ Administrator _____

 d. If you are not the owner as listed in No. 5(e), and (a), (b) or (c) above do not apply, please state the reasons for which you are submitting a Proof of Claim on behalf of another:

 _____
 _____
 _____

ALL PROOFS OF CLAIM MUST BE SUBMITTED BY _____ ,
1986, to the Administrator, c/o _____ ,
as set forth in the Notice of Court Approval, unless such date is extended by order of the Court. Any Settlement Class member who fails to file a valid and timely Proof of Claim (unless such untimely claim is accepted by Order of the Court) shall be barred from receiving any benefits of the settlement.

The undersigned submits this Proof of Claim and acknowledges that he or she has read the Notice of Conditional Class Certification and Hearing on Proposed Settlement and the Notice of Court Approval of Settlement and Dismissal, to which this Proof of Claim relates. The undersigned also has read the foregoing instrument and knows the contents hereof, and certifies under penalty of perjury that the information contained herein and in documents attached hereto is true to the best of his or her information and belief.

Dated: _____ , 1986

_____
[Signature(s)]

_____
[Signature(s)]

IMPORTANT: IF THIS CLAIM IS ON BEHALF OF JOINT PURCHASERS, ALL JOINT PURCHASERS MUST SIGN.

## SCHEDULE OF UNREIMBURSED REPAIRS

| Repair Order Date * | Mileage* | Repair Description | Dollar Amount of Unreimbursed Repair Expense Paid |
|---|---|---|---|

Attach additional sheets if necessary.

Under penalty of perjury, the undersigned certifies that the foregoing is true and correct to the best of my (our) knowledge.

Dated: _____, 1986

_____
[Signature(s)]

_____
[Signature(s)]

---

*/ If you do not have an exact record, set forth this information to the best of your recollection.